975 F.2d 868
 NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Norman E. MAI, Plaintiff/Cross-Appellant,
v.
THE UNITED STATES, Defendant/Appellant.
 Nos. 91-5152, 92-5012.
 United States Court of Appeals, Federal Circuit.
 July 8, 1992.
 
 Before PAULINE NEWMAN, Circuit Judge, BENNETT, Senior Circuit Judge, and CLEVENGER, Circuit Judge.
 CLEVENGER, Circuit Judge.
 
 
 1
 The United States appeals the March 12, 1991 decision of the United States Claims Court granting summary judgment in plaintiff's favor on his claim of illegal discharge from active duty as an Air Force Reserve officer. Mai v. United States, 22 Cl.Ct. 664 (1991). Norman E. Mai (Mai) cross-appeals the July 26, 1991 decision of the Claims Court upholding the Air Force's calculation of annual leave available to Mai upon his constructive retirement. Mai v. United States, No. 90-472C (Cl.Ct. July 26, 1991). Because the Claims Court correctly interpreted the law as to laches, we affirm the first judgment. Because the court clearly erred in sustaining the Air Force's calculation of Mai's annual leave, we reverse the second judgment, and remand the case for entry of judgment.
 
 
 2
 * Mai received his commission as a Reserve officer of the Air Force on August 13, 1964. In 1974 and again in 1975, Mai was passed over for promotion to major by two successive promotion selection boards, both of which included only one Reserve officer among its membership. On May 31, 1976 Mai was honorably discharged from active duty in the Reserves due to his non-selection pursuant to 10 U.S.C. §§ 8368, 8846 (1976). Mai enlisted in the regular Air Force on August 22, 1976 and served continuously until his voluntary retirement on October 1, 1984. Just over a year later, on October 22, 1985, Mai applied to the Air Force Board for Correction of Military Records (Board) to challenge the composition of the selection boards that denied him promotion. Mai claimed that those boards did not include an "appropriate number" of Reserve officers, which violated 10 U.S.C. § 266(a) (1976); consequently his non-selections were invalid, and thus he had a right to constructive reinstatement in order to obtain back pay. The Board considered Mai's application for 3 1/2 years before rejecting it as untimely. Mai, 22 Cl.Ct. at 667. Mai then filed suit in the Claims Court, challenging the Board's decision as arbitrary, capricious, contrary to law, and unsupported by the evidence.
 
 
 3
 The government opposed Mai's motion for summary judgment in the Claims Court, and cross-moved for summary judgment on the defense of laches. The Claims Court held that the statute of limitations was tolled, pursuant to the Soldiers' and Sailors' Civil Relief Act, 50 U.S.C. app. § 525 (1988), during Mai's service in the Air Force. Mai, 22 Cl.Ct. at 668-69. Thus, despite the passage of fourteen years' time since Mai's allegedly illegal discharge, the six-year statute of limitations had not run. Citing this Court's decision in Cornetta v. United States, 851 F.2d 1372 (Fed.Cir.1988) (in banc), the Court, without reaching the question of whether Mai's delay in filing his suit was unreasonable and unexcused, held that the government failed to demonstrate prejudice, thereby defeating the defense of laches. Mai, 22 Cl.Ct. at 669. The Court therefore entered summary judgment in Mai's favor on the merits and ordered the parties to advise it as to the corrections to be made to Mai's military record and what the judgment should be for back pay owed to Mai. Id. at 672.
 
 
 4
 After the Air Force calculated back pay and leave owed to Mai, a dispute between the parties arose regarding the leave portion of the calculation. In essence, the parties disagreed over roughly $3,000, which according to Mai was the amount due him for accrued but unused leave. The government voiced no argument on the merits as to the amount of back pay, but disagreed with Mai over the number of leave days for which it owed Mai compensation.
 
 
 5
 The maximum amount of unused leave a service person may accumulate and carry forward from year to year is 60 days, see 10 U.S.C. § 701(b) (1976 & 1988), and the same maximum governs the amount of accumulated and unused leave that can be cashed out upon retirement or discharge. See 37 U.S.C. § 501(f) (1976 & 1988). When Mai was discharged in 1976, he had accumulated 60 days of unused leave, for which he was paid $3,333.50. From his enlistment in 1976 to his retirement in 1984, Mai earned annual leave, some of which he took and some of which he carried over from year to year. As he entered his final year of enlisted service, Mai carried over 60 accumulated days of leave earned since enlistment, to which he added the thirty days of leave earned in his final year of service. Mai took 82 days of leave in the final year, which left him with eight days of unused leave at retirement.
 
 
 6
 In the Claims Court, the Air Force contended that due to his constructive reinstatement, Mai's account should be credited with the 60 days of leave accumulated at his 1976 discharge, and the amount of his back pay award should be reduced by the $3,333.50 he previously received. Next, the Air Force argued that the entire 60 days thus credited to Mai's constructive service record should be treated as if he had had the opportunity to use it following enlistment. Because the re-credited days when added to the leave Mai actually earned after enlistment in 1976 would push his account balance over the 60-day year-to-year limit, all 60 days of previously earned leave would be lost. Consequently, the Air Force maintained that Mai would only be allowed eight days of leave at retirement, even though the Air Force's calculation deprived Mai of the value of 60 days of unused and unpaid-for leave earned as an officer from 1964 to 1976.
 
 
 7
 Mai countered that he was entitled to pay for 60 days of unused leave because the Air Force's constructive account calculation, requiring both a return of the days and the money for them, was an unlawful application of the statutes governing his entitlement to pay for accumulated leave.
 
 
 8
 The Claims Court, expressing "some empathy relative to plaintiff's situation," Mai, No. 90-472C, slip op. at 6, nonetheless agreed with the Air Force's calculation. The court concluded as a matter of fact that Mai had "used all sixty days of annual leave with which he was constructively recredited...." Id. at 4. On that view of the facts, the court concluded that Mai could claim payment for only eight days of unused leave because he had not earned any additional unused days of leave.
 
 
 9
 Pointing to the lack of "any statutory or regulatory authority that would entitle him to be paid for more leave than he actually accrued[,]" id. at 6, the court denied Mai's motion for judgment in the amount of $94,028.32, and instead entered judgment based on the Air Force's calculation of back pay and leave credit in the amount of $91,216.26, minus applicable taxes. The court also ordered the Air Force to correct Mai's military records to show continuous constructive service on active duty as captain until his retirement on October 1, 1984.
 
 II
 
 10
 The government does not appeal the judgment for Mai on the merits. Instead, it argues that the Claims Court erred in denying its motion for summary judgment when the court held that laches does not apply to bar Mai's claim. While acknowledging this Court's holding in Cornetta that proof of economic prejudice cannot be established through liability for back pay alone, 851 F.2d at 1381, the government claims that "[i]n sharp contrast to the situation in Cornetta, the record in the present case contains compelling evidence of concrete prejudice to the Government." Brief for Appellant at 5. The government grounds this claim on two theories of prejudice.
 
 
 11
 First, it asserts that had Mai timely filed his complaint, won, and been reinstated, he again would have been subject to the annual evaluation process. Based on the opinion testimony in 1990 of the current Chief Officer of Promotions Policy, the government contends that Mai, after timely reinstatement, would not have been competitive for further promotion or retention on active duty because of his pre-reinstatement record, and consequently would have been properly discharged at an earlier date than October 1, 1984. As a result, the government avers that "[p]ayment for duties that Captain Mai would never have been asked to perform constitutes a concrete and substantial monetary consequence to the Government[,]" Appellant's Brief at 9, thus establishing economic prejudice, and thereby entitling it to assert the laches defense.
 
 
 12
 Second, the government contends that the constructive reinstatement of Mai has a disruptive effect on the military personnel management system, thus constituting a nonmonetary form of prejudice sufficient to satisfy the prejudice element of the laches defense.
 
 III
 
 13
 We review de novo the legal conclusions supporting the Claims Court's grant of summary judgment to determine whether they are correct as a matter of law. National Cable Television Ass'n v. American Cinema Editors, Inc., 937 F.2d 1572, 1576, 19 USPQ2d 1424, 1427 (Fed.Cir.1991). Here, the dispositive question is whether the government satisfied the prejudice element of the laches defense. As our in banc decision in Cornetta deals directly with this issue, a brief review of it is in order.
 
 
 14
 Cornetta was passed over twice for promotion to major in the Marine Corps, and consequently was discharged. Subsequent to that discharge, he served in the Coast Guard for three years. Seven years after his discharge from the Marine Corps, Cornetta brought suit in district court requesting back pay and reinstatement. 851 F.2d at 1374, 1375. The district court granted summary judgment to the government on the basis of laches, but this Court reversed. In so doing, this Court held, inter alia, that "potential receipt of back pay alone is insufficient to show prejudice to the government...." Id. at 1381. The Court left open the possibility that presumptive economic prejudice might exist if the military procured a replacement from outside the service, thus necessitating going outside the normal employment pool. Id. at 1379. But in Mai's case, the government has not alleged any special replacement for Mai was ever hired. The government's allegation as to economic prejudice is thus reduced, as it was in Cornetta, to the fact that it must now pay Mai for services he would never have performed. Since this allegation lacks any distinguishing characteristic from the economic prejudice argument advanced and rejected in Cornetta, the government fails to prove economic prejudice.
 
 
 15
 Moreover, the government's contention as to economic prejudice does not consider the possibility that Mai's hypothetical post-reinstatement record might have overcome the assumed problems with his actual pre-reinstatement record, in which case the government's hypothetical economic harm theory would have no foundation. Nor does the government explain why it argued to the Claims Court that Mai "might have failed to be selected a second time", but argues to us that Mai "would not have been 'competitive for promotion and retention on active duty.' " Brief for Appellant at 12 (quoting its expert's opinion).
 
 
 16
 Furthermore, it appears that the government's degree of economic prejudice is considerably less than the 8 years of officer pay of which the government complains. The number of years of delay in filing suit after 1984 is irrelevant to the prejudice analysis because Mai's retirement in 1984 ended the government's liability for pay; the government makes no claim of defense prejudice.
 
 
 17
 When Mai was discharged in 1976, he had no reason to believe that the composition of his selection boards was unlawful. In 1979, the Court of Claims held that promotion selection boards with only one Reserve officer member were illegal. Stewart v. United States, 611 F.2d 1356 (Ct.Cl.1979). If just after Stewart Mai successfully had petitioned the corrections Board--the Board which took three and one-half years to find his actual petition untimely--he would have been reinstated at the soonest in 1980. If selection boards acting in 1981 and 1982 had passed Mai over, a discharge in the 1982-83 period would have entitled Mai to full officer pay for approximately 75 percent of the amount he obtained as a result of his later-filed challenge. The amount of back pay to which Mai would have been entitled, had he pursued the prompt litigation course the government suggests is necessary to avoid laches, cannot be deemed a part of economic prejudice arising from delay in filing.
 
 
 18
 The government also argues that the constructive reinstatement of Mai as an officer through his actual retirement date of October 1, 1984 disrupts the military personnel management system, and thus constitutes a type of harm, distinct from defense and economic prejudice, that entitles it to raise the laches defense. The government urged a similar prejudice in Cornetta, which the Court rejected:
 
 
 19
 The government argues that delay in seeking reinstatement presumptively is prejudicial because it will have a disruptive effect on the military personnel management system. An appellee may present any argument on appeal in support of the judgment but only if it is fairly supported by the record ... which this is not. It was not mentioned in the district court so we have nothing but argument of counsel presented for the first time on rehearing in banc. Nevertheless, in view of our discussion, especially part II E, we reject the presumptiveness aspect of this argument. We leave for an actual case on an appropriate record the question of whether the disruption that attends any successful suit for reinstatement can be so severe as to establish prejudice sufficient to bar the suit.
 
 
 20
 851 F.2d at 1379 n. 1 (citation omitted).
 
 
 21
 The government again fails to present an appropriate case for examination of this issue. Mai's reinstatement was constructive only, a matter of paper record. The correction of his military records served merely to entitle him to back pay and higher retirement pay. Mai never displaced any current officers, never gained any advantage over his peers by avoiding the selection process that they underwent, or caused any disruption. The evidence offered by the government attempts but fails to establish the kind of prejudice to which the Court referred in footnote 1 of the Cornetta opinion. The government states that Mai's delay in bringing suit allowed him to avoid two further evaluations that would have occurred had he prosecuted an earlier successful challenge to his discharge, and to recoup pay for service not rendered at officer rank. This evidence relates to economic prejudice, not to the sort of personnel disruption that could occur if a discharged person is reinstated in the military service. The only adverse effect on the government is financial. Furthermore, this is not a case about a successful suit for actual reinstatement. No discharged officer is returning, after years of absence, to active duty in circumstances demanding combat readiness. Nor is this a situation requiring other qualifications inconsistent with those of the returning officer or those of the unit to which he might return. Mai never served on active duty in his reinstated status. As in Cornetta, we leave for another day the question of whether a successful suit for reinstatement might so interfere with the military personnel management system as to establish "nonmonetary, perhaps reliance based, prejudice," 851 F.2d at 1383, and whether such prejudice can only be shown in a case involving actual reinstatement.
 
 IV
 
 22
 Mai cross-appeals the July 26, 1991 decision upholding the Air Force's calculation of annual leave available to Mai upon his constructive retirement. Mai, No. 90-472C (Cl.Ct. July 26, 1991). Since Mai's discharge in 1976 was void, the Air Force proposed to re-credit his leave account with the 60 days of accrued and unused leave he cashed out on May 31, 1976 pursuant to 37 U.S.C. § 501(b)(1) (1976), and recoup the $3,333.50 previously paid for those days, by offsetting the amount of officer-level back pay due to Mai. The Air Force then, in reconstructing Mai's leave account in his hypothetical capacity as Reserve officer, debited both his leave account with the amount of days he actually took while enlisted with the Air Force subsequent to his illegal discharge, and with the re-credited 60 days, since no more than 60 days can be carried from year to year. See 10 U.S.C. § 701(b) (1988). The Air Force's calculation thus leaves Mai with eight days total accrued and unused leave from his 1976-84 enlistment, and no benefit whatsoever for the 60 days of leave accumulated at his discharge in 1976.
 
 
 23
 Mai argued below that Schmidt v. United States, 427 F.2d 720 (Ct.Cl. 1970) establishes that he was entitled to credit for his 1976 unused leave up to the statutory maximum, which he could then cash out at his retirement in 1984. In Schmidt, an officer passed over and discharged had accumulated 43 days of leave for which he was paid upon discharge. Subsequent service after enlistment resulted in Schmidt's later retirement. Having accrued an additional 38 days of unused leave, Schmidt again received payment for leave upon retirement, making a total of 81 days of leave for which he had been paid. When Schmidt's discharge was held illegal, his service record was corrected to show continuous officer status for pay and benefits, and to award Schmidt 60 days of leave. At that time, the government offset Schmidt's pay claim to recoup 21 days of already-paid leave, because the maximum amount of leave available for cashing out was (and is) 60 days. See 37 U.S.C. § 501(f) (1964 & 1988). Schmidt contended he was entitled to the full 81 days; the Court of Claims denied his claim because the statute clearly limits the maximum accumulation to 60 days. The Court of Claims, however, held that the allowance of 60 days of leave was "the amount to which he is entitled...." 427 F.2d at 721. In reaching that conclusion, the Court of Claims necessarily refused to imply a constructive removal of the 43 days of leave accumulated at the time of the illegal discharge.
 
 
 24
 The Claims Court erred in Mai's case by reading Schmidt solely to stand for the proposition that no more than 60 days of leave can be cashed out: "an error committed by the government [paying Schmidt for over 60 days, does not] support a recovery in direct contravention of an act of Congress." Id. at 721. Schmidt necessarily also teaches that accumulated leave available at discharge can be added to available leave at retirement, up to the maximum of 60 days, when an illegal discharge requires recomputation of the leave accounts. Otherwise, the maximum amount of leave for which Schmidt could have legally been paid was 38 days. On appeal, Mai contends that the Claims Court misconstrued Schmidt, and the government does not cite or discuss the precedent.
 
 
 25
 10 U.S.C. § 701(a) (1988) entitles a service member to two and one-half calendar days of leave per month of active duty service. The statute entitles a service member either the opportunity to use earned leave, or accrue leave and carry it forward. However, no more than 60 days of leave can be carried forward from year to year. 10 U.S.C. § 701(b) (1988). At the time of Mai's illegal discharge, 37 U.S.C. § 501(f) (1976) forbade cashing in more than a total of 60 days of leave, regardless of any change in status: "For the purposes of this subsection, the number of days upon which payment may be based shall be determined without regard to any break in service or change in status in the uniformed services." The current statutory scheme is the same. 37 U.S.C. § 501(f) (1988). The Claims Court reasoned that Mai had no entitlement to be paid for more leave than he actually accrued. Mai, No. 90-472C, slip op. at 6. We have no quarrel with such sound reasoning. However, the court found that "Mai used all but eight days of his accrued annual leave during his last year of enlistment. Thus, he used all sixty days of annual leave with which he was constructively recredited, plus twenty-two of the thirty days he earned in the 1983-84 period." Id. at 4 (emphasis added). This finding is clearly erroneous. During his enlisted service from 1976-84, Mai earned and accrued 30 days of leave per year. He used 15 days in Fiscal Year (FY) 1977, 17 days in FY 1978, 24 days in FY 1979, 4 days in FY 1980, 42 days in FY 1981, 28 days in FY 1982, 16 days in FY 1983, and 82 days in FY 1984. By the end of FY 1983, Mai had earned and accrued 73 days of leave, but lost 13 days of that leave at the beginning of FY 1984 due to the statute's prohibition against carrying more than 60 days forward. Thus, Mai entered his last year of enlisted service carrying 60 days of leave, and earned an additional 30 during the year. [Id.] He was thus able to take a total of 82 days of leave during his last year, thereby using the majority of his earned leave. Contrary to the finding of the Claims Court, Mai was able to take 82 days of leave during his last year because he had earned those days independently of the 60 days later re-credited to his leave account. The conclusion that Mai had left only eight days of earned and unused leave upon retirement is thus clearly erroneous.
 
 
 26
 The cumulative effect of the Claims Court's narrow reading of Schmidt and its error in finding that Mai had used his carryover 60 days of leave denies Mai the statutorily given options of either taking the leave, or accumulating it for annual carryover, subject to the 60 day maximum. Mai did not use the 60 days of leave carried over from the 1976 discharge, and under the decision of the Claims Court he was not paid for it. Schmidt precludes the constructive erasure of these 60 unused days from Mai's leave account. Mai is not, as Schmidt was not, entitled to more leave than the statute allows (eight additional days in Mai's case; 21 in Schmidt's); like Schmidt, Mai is entitled to 60 days of accumulated leave at retirement.
 
 
 27
 The record before us is unclear whether Mai has actually repaid the government the $3333.50 for the 60 days he cashed out in 1976. Mai is of course entitled to only one payment for the 60 days. Thus on remand the court shall enter a judgment for Mai which gives him the value of 60 days of leave, taking into account any repayment Mai has or has not made for the days he cashed out in 1976.
 
 V
 
 28
 We therefore reverse the Claims Court on the leave calculation portion of its July 26, 1991 judgment, and remand the case for entry of a judgment including the value of 60 days of leave.
 
 
 29
 No Costs.
 
 
 30
 AFFIRMED-IN-PART, REVERSED-IN-PART and REMANDED.