THIS OPINION IS CITABLE AS
PRECEDENT OF THE TTAB

Mailed: November 18, 2005
PTH

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

Chester L. Krause
v.
Krause Publications, Inc.
_____

Cancellation No. 92041171
_____

John A. Clifford and Andrew S. Ehard of Merchant & Gould P.C. for Chester L. Krause.

Daniel T. Flaherty and Brian G. Gilpin of Godfrey & Kahn, S.C. for Krause Publications, Inc.
_____

Before Seeherman, Hairston and Zervas, Administrative Trademark Judges.

Opinion by Hairston, Administrative Trademark Judge:

A petition has been filed by Chester L. Krause to cancel a registration issued to Krause Publications, Inc. for the mark KRAUSE PUBLICATIONS (PUBLICATIONS is disclaimed) for the following goods and services:

> Magazines featuring information regarding all of the following subject matters, antiques and collectibles, collectible card games, interior decorating, comics, antique automobiles and military vehicles, business information for professional crafters, arts and crafts, fantasy sports, hunting, firearms, collectible toy cars, trucks, farm equipment and other related vehicles,

rock and roll memorabilia, stamp collecting, scrap booking and memory crafts, business information for the post-frame building construction industry, rural construction, sports memorabilia, numismatics, coins, and collectible paper money (including stocks and bonds), toys, movies and related memorabilia, knives, business management for the sports card industry; trading cards on knives, series of books and price guides relating to antiques and other collectibles, coins and firearms; calendars in Class 16;

Dissemination of advertising of others relating to hobby and collectible items via a global computer network; arranging and conducting trade shows featuring knives, daggers, swords, and cutlery; arranging and conducting trade shows featuring coins; arranging and conducting trade shows featuring sports cards, antiques and other collectibles in Class 35;

Entertainment services in the nature of competitions and awards in the field of cutlery in Class 41; and

Conducting awards programs to recognize excellence in designs and themes of newly minted coins in Class 42.[1]

As grounds for cancellation, petitioner asserts that he "has been active in publishing newspapers and magazines in the fields of antiques and collectables, collectable cards and card games, numismatics, coins, memorabilia, and matters of interest to collectors of all kinds since at least 1952;" that he "has also been active in

---

[1] Registration No. 2,573,101, issued May 28, 2002; claiming January 7, 1969 as the dates of first use as to the goods in Class 16; May 12, 1981 as the dates of first use as to the services in Class 35; June 1995 as the dates of first use as to the services in Class 41; and the year 1983 as the dates of first use as to the services in Class 42.

the field of disseminating advertising within the hobby, collectable, and craft industry, hosting competitions, conferences, assemblies, and the like in the field of collectables, including collectible cutlery, and conducting award and incentive programs concerning numismatics and coins since at least the 1970's;" that "at all times Petitioner employed the surname KRAUSE in conducting his business and hobby interests;" and that "Petitioner's rights in the name KRAUSE predate the first use dates claimed by Registrant."

Further, petitioner alleges that he "founded a periodical called *Numismatic News*, first published on October 13, 1952 and published continuously thereafter up to the present day;" that petitioner "has been personally active in this field for over 50 years, and is well known in the field of magazines for collectors and hobbyists of all kinds, and is well known in the field of dissemination of advertising for others within this field of interest, related entertainment services within this field, and conducting award programs with respect to coins and numismatics;" that petitioner "has made numerous appearances at shows, conferences, conventions, and gatherings of collectors and hobbyists for decades and has made 100's of such appearances beginning at least in the 1970s;" that "from a time long prior to the dates of first use claimed in

Registration No. 2,573,101, the name KRAUSE has been well-known and associated with Petitioner in the fields of collecting and publishing;" and that "Petitioner's personal fame and reputation in these fields is substantial and continuing."

Also, petitioner alleges that he "was involved in founding a company called Krause Publications which later became Respondent Krause Publications, Inc.;" that "Petitioner served as president, and in other capacities at various times of Registrant;" that he "stepped down as President of Registrant on December 31, 1990;" that he "is no longer involved in the day-to-day operations of Registrant, and is unable to control the quality and nature of the goods and services Registrant produces under the registered mark;" that "the name Krause in KRAUSE PUBLICATIONS represents and identifies a particular living individual, namely Petitioner, and Petitioner has not given his written consent for the registration of that name in Registration No. 2,573,101;" and that Registration No. 2,573,101 issued in violation of Section 2(c) of the Trademark Act.[2]

---

[2] Petitioner also pleaded a claim of likelihood of confusion. However, petitioner presented no argument in support of such a claim in either his main brief or reply brief and we therefore deem plaintiff to have waived this pleaded ground.

Respondent, in its answer, admits that petitioner has been active in the field of collecting coins, paper money, and cars, but asserts that between the date respondent was incorporated in 1964 and petitioner's retirement as president of respondent in 1990, petitioner's only activity in publishing newspapers and magazines and in disseminating advertising in the fields of antiques and collectibles was through respondent. Further, respondent admits that it did not submit a written consent signed by petitioner when it applied for registration, but denies that such consent is necessary, including a specific denial that the mark KRAUSE PUBLICATIONS identifies petitioner. Respondent denied the remaining allegations of the petition to cancel.

As affirmative defenses, respondent asserts that "[i]n 1964, at the time that Krause Publications was incorporated, Chester Krause transferred all of the going concern of the business known as 'Krause Publications,' including the trade name and trademark KRAUSE PUBLICATIONS, to the company;" that "since the date of its incorporation, the Company has operated as a separate entity and has continuously used the trade name and trademark KRAUSE PUBLICATIONS in its business;" that in 1988 the Company formed an employee stock ownership plan (ESOP), and between 1988 and 1995 petitioner sold all of his shares of stock in respondent to the ESOP; that the shares of stock in respondent that petitioner had

5

previously given to family members as gifts were redeemed by respondent between 1988 and 1998; that to finance the purchase of shares of stock in respondent, respondent borrowed millions of dollars, with loans secured by respondent's corporate assets, including all of its trademarks; and that these corporate borrowings were done with the full knowledge of petitioner. Further, respondent asserts that "since the date that Krause Publications was incorporated, and continuing for a number of years even after the sale of all of Chester Krause's stock in the Company in 1995, Chester Krause did not object to the use of the name KRAUSE PUBLICATIONS by the Company; it was only when the Company's stock was sold a second time--by the ESOP to the current owner F&W Publications, Inc.--did Chester Krause raise any objection to the continued use and registration of the KRAUSE PUBLICATIONS name by the Company."

Further, respondent asserts that petitioner would be unjustly enriched if he were permitted to convert to his own use a valuable asset of the Company--the Company's trade name and trademark KRAUSE PUBLICATIONS--following the sale of his stock in Krause Publications to the ESOP; that petitioner breached his fiduciary duty as an officer and director of the Company when he sold his shares in the Company to the ESOP without disclosing his intent to sell

6

less than his entire interest in the business, and therefore he is precluded from obtaining the relief he seeks due to unclean hands; and that petitioner acquiesced in Krause Publications' use and registration of the name KRAUSE PUBLICATIONS, has waived any objection thereto, and is estopped from objecting to such use and registration.

The record consists of the pleadings, and the file of the involved registration. Petitioner Chester Krause has submitted his testimony deposition (with exhibits) and the testimony depositions (with exhibits) of Clifford Mishler, former chairman of the board and president of respondent; Patricia Klug, former employee of respondent; Kenneth Nimocks, president of the Wisconsin chapter of the American Numismatics Association; Edward Rochette, former executive director of the American Numismatics Association; Barry J. Meguiar, president and CEO of Meguiar's Incorporated; and Andrew S. Ehard, associate attorney at petitioner's law firm. In addition, petitioner submitted, under notice of reliance, respondent's answers to petitioner's interrogatories and requests for admissions; and the discovery depositions of Roger Case, former president of respondent, and Arlyn Sieber, assistant to the president of respondent.

Respondent submitted the testimony deposition that it took of petitioner Chester L. Krause; and notices of

7

reliance on petitioner's answers to respondent's discovery requests, the discovery deposition (with exhibits) of petitioner, and copies of registrations owned by respondent. Pursuant to the parties' stipulation, respondent submitted portions of the discovery deposition (with exhibits) of Bruce Meagher, assistant secretary of respondent; correspondence exchanged between the parties; purchase and sale agreements; corporate resolutions; financing documents; and articles from printed publications.

Briefs have been filed, but an oral hearing was not requested.

Before turning to the merits of the case, we note that respondent interposed numerous objections during the taking of petitioner's testimony depositions in this case and asks that we deem inadmissible all testimony to which it objected. The Board does not ordinarily strike testimony taken in accordance with the applicable rules on the basis of substantive objections; rather, such objections are considered by the Board in its evaluation of the probative value of the testimony at final hearing. TBMP Section 707.03(c). In this case, we have not stricken any testimony offered by petitioner. But, in reading petitioner's evidence, we have considered the trial testimony in light of respondent's objections. Where we have relied on testimony to which respondent objected, it should be apparent to the

parties that we have deemed the material both admissible and probative to the extent indicated in the opinion.

Petitioner, testifying in his own behalf, stated that in 1952 he started a monthly publication in the field of coins and coin collecting known as "Numismatic News." In 1960 petitioner purchased the publication "Coin Press" and changed the name to "Coins Magazine." During this time, petitioner operated his publishing business as a sole proprietorship under the name "Krause Publications," with the trade name intended to refer to petitioner as the sole owner of both publications. In 1964 petitioner incorporated his publishing business in Wisconsin under the name "Krause Publications, Inc." This company is now the respondent in the current proceeding. In 1988 petitioner, as president of respondent corporation, established an Employee Stock Ownership Plan (ESOP) whereby employees are allowed to purchase shares in the company. The record shows that respondent corporation has grown into a major publisher of hobby magazines, newspapers and price guides with over 650,000 subscribers and revenues in excess of $50 million a year. For nearly fifty years, petitioner was associated with respondent as its president and/or chairman of the board and subsequently as an employee. In 2002 petitioner was terminated as an employee of respondent.

Petitioner is an avid coin collector and estimates his collection at approximately 50,000 pieces. Since 1972 petitioner has coauthored "The Standard Catalog of World Coins." This catalog is considered the worldwide authority for coin collectors. The "Standard Catalog of United States Paper Money" also bears petitioner's name, and this catalog has been published annually since the early 1980s. Petitioner testified that he "[has] all the illustrative material in that catalog and devised the method of cataloging it in the right order..." (Krause 6/16/04 testimony dep., p. 187.) In the early 1980s petitioner coauthored a publication titled "Guidebook of Franklin Mint Issues," which has since been discontinued.

Petitioner testified that he has lectured at "probably a dozen meetings" of the American Numismatic Association over the years, as well as at a number of other clubs and associations devoted to numismatics. (Krause 6/16/04 dep., p. 69). For example, the record shows that petitioner lectured at a meeting of the Red Rose Coin Club of Lancaster, Pennsylvania on October 4, 1971; at a meeting of the Gateway Coin Club of San Antonio, Texas on October 13, 1984; at a joint meeting of the Society of Paper Money Collectors and the International Bank Note Society on August 8, 1986; and at the 1986 American Numismatic Association annual convention.

Petitioner was the recipient of the American Numismatics Association's (ANA) highest honor, the Farran Zerbe Award, in 1977; and the ANA's Numismatist of the Year Award in 1999. Additionally, petitioner has been enshrined in the ANA's Hall of Fame. Ed Rochette, former executive director of ANA, testified that "my personal opinion is that Chet Krause is the most recognizable living person involved in the hobby today," (Rochette dep., pp. 22-23), and that "the hobby today is because of Chet Krause and no other person." (Rochette dep., p. 74).

In 1961, President Kennedy appointed petitioner to the United States Assay Commission, whose purpose was to determine whether the coins of the United States were issued in accordance with legal requirements for weight, fineness and count.

Petitioner also is an avid collector of vehicles and related items. His collection was the subject of a film made by the Society of Automotive Historians entitled "A Walk Through Automotive History With Chet Krause." In 2002 the Society bestowed on petitioner its "Friend of Automotive History Award." Petitioner received the first annual "Collector Car Hobby's Person of the Year Award" in 1995 by Meguiar's Incorporated. Barry Meguiar, CEO of Meguiar's Incorporated, testified that "[t]he purpose of the award is to honor people who have made, personally made an impact on

11

the Car Hobby and helped take it to another level, helped to expand the awareness of the hobby, to attract other people in the hobby." (Meguiar dep., p. 22).

Petitioner testified that he is a founder of the Iola (Wisconsin) Car Show and Swap Meet, an event that attracts more than 130,000 collectors and automotive historians annually. In the summer of 1994 petitioner auctioned off a large portion of his vehicles and related items at an event that was attended by more than 3,000 collectors.

Petitioner's contributions to respondent Krause Publications have been highlighted in three books published in connection with respondent's forty, forty-five and fifty year anniversaries. The books are titled, respectively, "The History of Krause Publications – Just Plain Chet"; "A Building Is Only As Good As Its Foundation – Krause Publications' Traditions and Philosophies at 45 Years;" and "Pioneer Publisher – The Story of Krause Publications' First 50 Years."

At a 1995 ceremony honoring petitioner, respondent's then-president Cliff Mishler stated that "[petitioner will] always constitute the real embodiment of Krause Publications, regardless of your ownership or lack thereof, your business role, or your physical presence in the business… it should never and can never be any other way." (Petitioner's exhibit 55; Mishler dep., pp. 17-19).

In 2002 respondent placed in its various publications print advertisements celebrating its 50th anniversary. The advertisements include a picture of petitioner standing atop a tank he owned at the time with the headline: "When the boss owns the tank, you tend to work harder." The remainder of the advertisement reads:

> In 1952, Chet Krause created Numismatic News from a desk in his family's home in rural Iola, Wisconsin. Today, Krause Publications is the world's largest hobby and collectibles publisher. While his enterprise has grown beyond his wildest dreams, Chet is still the same dedicated collector he's always been. Help Chet and everyone at Krause Publications celebrate an anniversary that is truly golden.

> (Petitioner's exhibit 35).

Petitioner also is a philanthropist, having made substantial gifts to the Marshfield Clinic Laird Center and the Rawhide Boys Ranch, both of which are located in Wisconsin. Also, petitioner purchased snow-grooming equipment for the cross-country ski trails in his hometown of Iola, Wisconsin. The town of Iola has bestowed on petitioner the 2002 Outstanding Citizen Award, has held a "Chet Krause Day", and renamed a street in his honor. In 1990 the U.S. Small Business Administration named petitioner Wisconsin Small Business Person of the Year.

Petitioner's attorney testified that he conducted an Internet search using the Google search engine for the name "Chester L. Krause" that returned approximately 17,000

13

references. A representative sample of the results of the search was made of record and it shows that the majority of the references are to books that petitioner has authored. Also, petitioner's attorney conducted a search of the "Lexis ALLNEWS" database for the name Chester L. Krause that returned 64 articles about petitioner. Petitioner made of record each of the articles, in its entirety. The articles are taken from a variety of newspapers, ranging from "The Post-Crescent" (Appleton, Wisconsin) to the "Chicago Tribune" and "New York Times." The vast majority of the articles relate to coin and paper money collecting and mention petitioner; others relate to petitioner's philanthropic activities and his association with respondent Krause Publications.

It is petitioner's position that he has achieved renown in the multiple fields of numismatics, car collecting, business, publishing and philanthropy; and that he is so well known by the public in general that they would assume a connection between petitioner and the mark KRAUSE PUBLICATIONS. Alternatively, petitioner contends that he is publicly connected with the business in which the mark KRAUSE PUBLICATIONS is used such that an association would be presumed between petitioner and the mark KRAUSE PUBLICATIONS.

Respondent argues that petitioner has not demonstrated that he is well known to the public in general or that he is publicly connected with the fields in which the mark KRAUSE PUBLICATIONS is used.  According to respondent, petitioner is at most known by a limited number of persons as a collector of coins and cars.  Respondent argues that KRAUSE PUBLICATIONS refers to respondent; that through written agreements and actions, petitioner has given his implied consent to register the mark; and that petitioner has waived any rights he may have had in the mark KRAUSE PUBLICATIONS in that petitioner has acquiesced in respondent's use and registration of the mark.

Section 2(c) of the Trademark Act, 15 U.S.C. §1052(c), prohibits registration of a mark that consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent. The provisions of Section 2(c) are applicable to a "name … identifying a particular living individual," be it a full name, a nickname or a surname, so long as the name points to a particular living person.  See In re Sauer, 27 USPQ2d 1073 (TTAB 1993), aff'd, 26 F.3d 140, 32 USPQ2d 1479 (Fed. Cir. 1994), and the cases cited therein.  Thus, the mark KRAUSE PUBLICATIONS, although it includes only the surname of petitioner, would fall within the provisions of Section 2(c) if petitioner establishes that KRAUSE, as used on or in

15

connection with the goods and services set forth in the involved registration, points uniquely to him "as a particular living individual."

A name is considered to "identify" a particular living individual for purposes of Section 2(c) only if the "individual bearing the name in question will be associated with the mark as used on the goods [or services], either because the person is so well known that the public would reasonably assume the connection, or because the individual is publicly connected with the business in which the mark is used." Martin v. Carter Hawley Hale Stores, Inc., 206 USPQ 931, 933 (TTAB 1979). See also, In re Sauer, supra; and Ross v. Analytical Technology Inc., 51 USPQ2d 1269 (TTAB 1999).

In the Martin case, registration of the mark NEIL MARTIN was sought for men's shirts. Opposer Neil Martin, although well known in his own professional and social circles, failed to establish that he was so famous as to be recognized by the public in general or that "he is or ever was publicly connected or associated with the clothing field." Id. at 933. Thus, the Board found that opposer's name did not fall within the provisions of Section 2(c).

The opposite conclusion was reached in the Sauer case, where the mark sought to be registered was BO BALL for a sports ball. The Board found the name BO to be the

recognized nickname of Bo Jackson, a professional football and baseball star, and further found that he was so well known by the public in general that use of the name BO in connection with a sports ball would lead to the assumption that he was in some way associated with the goods.

In the Ross case, where the applicant sought to register the mark ROSS for electrochemical analysis equipment, the evidence was found sufficient to establish a Section 2(c) claim. The Board found that opposer, Dr. James W. Ross, Jr., was publicly connected with the electrochemical analysis equipment field and that use of the name ROSS in connection with equipment in the field would lead to the assumption that Dr. Ross was in some way associated with the goods. The evidence showed that the name ROSS was intentionally selected by the applicant to be used as a mark for electrodes because of opposer's development of the product, and the association of opposer with the product was acknowledged by applicant.

In the present case, the record fails to establish that petitioner is so well known by the public in general that a connection between petitioner and the mark KRAUSE PUBLICATIONS would be presumed. Petitioner has not demonstrated that his renown in the fields of business, numismatics, car collecting, and publishing is at a level anywhere near that of Bo Jackson in the Sauer case. The

evidence establishing the fame of Bo Jackson consisted of Bo Jackson baseball and football cards; advertisements for Bo Jackson figurines and toys; a copy of a tag from a Bo Jackson model baseball glove; a copy of a Cheerios cereal box referring to Bo Jackson; and copies of magazines with articles about and cover references to Bo Jackson. These are the kinds of items that are purchased by a substantial portion of the public. Also, it is common knowledge that the general public is exposed to professional athletes through television and radio broadcasts of games and other sports programming. In the present case, the fields of numismatics, car collecting, and publishing of hobby magazines are niche markets and there is insufficient evidence to establish that petitioner's activities in these fields are well known to the general public. Further, petitioner's philanthropic activities clearly are more local than national in scope, and it is unlikely that the public in general knows of petitioner as a result of these activities.

Thus, on the record before us, we find that petitioner has not demonstrated that he is so well known by the public in general that persons would assume a connection between petitioner and the mark KRAUSE PUBLICATIONS.

However, we find that there is sufficient evidence to establish that petitioner is publicly connected, at the very

18

least, with the fields of numismatics, car collecting, and publishing activities related thereto, such that a connection between petitioner and the mark KRAUSE PUBLICATIONS would be presumed by people who have an interest in these fields.  Moreover, since respondent's registration covers, inter alia, magazines featuring antique automobiles and numismatics, conducting trade shows featuring coins, and conducting award programs regarding coins, this connection would be assumed by the consumers of respondent's goods and services as identified in Classes 16, 35 and 42.

The record shows that petitioner started his publishing business as a sole proprietorship under the name "Krause Publications," with the trade name intended to refer to petitioner.  Petitioner was associated with respondent as its president and/or chairman of the board for nearly fifty years.  Additionally, respondent itself has acknowledged petitioner's contributions in three books highlighting such contributions as well as advertisements acknowledging such contributions in respondent's various publications.

Also, petitioner has coauthored at least three publications in the field of numismatics, including "The Standard Catalog of World Coins," which is considered the worldwide reference authority for coin collectors.  Further, petitioner has lectured across the country on the subject of

19

numismatics and is the recipient of awards from national and local organizations in recognition of his contributions to the field.

Insofar as the field of car collecting is concerned, petitioner is the recipient of the 1995 "Collector Car Hobby's Person of the Year Award" in recognition of his contributions to this field. His extensive car collection was the subject of a film by the Society of Automotive Historians and he is a founder of the Iola Car Show and Swap Meet.

Additionally, it is significant that respondent produced no witnesses or other evidence to show that the name "Krause" appearing in KRAUSE PUBLICATIONS INC. refers to someone other than petitioner in the field of numismatics, car collecting and publishing activities related thereto. In Reed v. Bakers Engineering & Equipment Co., 100 USPQ 196, 199-200 (Exam'r in Chief 1954), Paul Reed filed a petition to cancel the registration of the mark REED REEL OVENS for baker's ovens. The evidence showed that the name "Reed" in the mark REED REEL OVENS was selected because of its reference to petitioner Paul Reed, the engineer who designed and built the ovens, and that Mr. Reed was initially active in the partnership that sold the ovens. The Examiner in Chief stated that:

> It seems to me that "Reed" on the ovens also
> identified petitioner to the customers at least

20

during the first several years of the business in view of the personal contact of the petitioner with the customers in installing and servicing the ovens. Under these circumstances, it seems to me that the burden of proof is upon the respondent to show that Reed does not refer to and identify petitioner . . . and respondent produced no witnesses to show that the name Reed appearing in 'Reed Reel Ovens' does not refer to and identify petitioner in the particular trade.
Id at 199-200.

In the present case, the record shows that petitioner started his publishing business as a sole proprietorship under the name "Krause Publications," with the trade name intended to refer to petitioner. Further, the record shows that petitioner was associated with respondent as its president and/or chairman of the board for nearly fifty years. As in Reed, the respondent here has not rebutted the showing that, because of petitioner's activities, purchasers would make an association between petitioner and the mark KRAUSE PUBLICATIONS.

In view of the foregoing, we find that petitioner has demonstrated that he is publicly connected with at least some of the goods and services identified in respondent's registration in Classes 16 (e.g., magazines featuring information regarding antique automobiles, numismatics and coins), 35 (e.g., arranging and conducting trade shows featuring coins) and 42 (conducting awards programs to recognize excellence in designs and themes of newly minted coins). To prevail under Section 2(c) against a class in

21

respondent's registration, petitioner is not required to demonstrate that he is publicly connected with all of the goods and services listed in the class. Rather, it is sufficient that petitioner has shown that he is publicly connected with at least some of the goods and services in that class. Cf., In re Analog Devices Inc., 6 USPQ2d 1808, 1810 (TTAB 1988), *aff'd without pub. op.,* 871 F.2d 1097, 10 USPQ2d 1879 (Fed. Cir. 1989) ["… it is a well settled legal principle that where a mark may be merely descriptive of one or more items of goods in an application but may be suggestive or even arbitrary as applied to other items, registration is properly refused if the subject matter for registration is descriptive of any of the goods for which registration is sought."]; and Tuxedo Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) ["[A] likelihood of confusion must be found if the public, being familiar with appellee's use of MONOPOLY for board games and seeing the mark on *any* item that comes within the description of goods set forth by appellant in its application, is likely to believe that appellee has expanded its use of the mark, directly, or under a license, for such item."][emphasis in original].

Petitioner has not demonstrated, however, that he is publicly connected with the services in Class 41, namely, "entertainment services in the nature of competitions and

awards in the field of cutlery." There is no evidence that petitioner has authored or lectured in the field or that he has made significant contributions to the field. In this regard, we note that petitioner has not argued in his main brief or reply brief that he is well known in the field of cutlery. Also, we note the following testimony of petitioner during his discovery deposition:

> Q. Have you ever had personal involvement in the area of competitions or awards involving knives or cutlery?
> A. No, I haven't.

(Krause discovery dep., pp. 159-160).

We turn next to respondent's arguments that petitioner implicitly consented to the registration of KRAUSE PUBLICATIONS. In this regard, respondent argues that petitioner gave his implicit consent to register when petitioner incorporated his business; when petitioner subsequently sold his stock in respondent to set up an Employee Stock Option Plan (ESOP); and when petitioner, as president and chairman of the board of respondent, pledged respondent's assets, including trademarks and trade names, to finance expansion and acquisitions.

In support of its position that petitioner gave his implicit consent when petitioner incorporated the business and subsequently sold stock to set up the ESOP, respondent relies on Dovenmuehle v. Gilldorn Mortgage Midwest Corp., 871 F.2d 697, 10 USPQ2d 1550 (7th Cir. 1989) and In re D.B.

23

Kaplan, 225 USPQ 342 (TTAB 1985). Citing Dovenmuehle v. Gilldorn, respondent argues that "implied consent is considered sufficient in the context of a sale of a business without a reservation of rights because the intent to transfer goodwill and trademarks to the buyer is presumed when a business is sold as a going concern, even if goodwill and trademarks are not

specifically mentioned in the contract of sale." (Brief, p. 9). In the Dovenmuehle case, plaintiffs claimed defendants' use of a trade name violated §43 of the Lanham Act. The issues on appeal were "first, whether the district court correctly held that plaintiffs lacked standing under §43(a) of the Lanham Act to challenge defendants' use of the trade name 'Dovenmuehle,' and second, whether the district court could properly award defendants the cost of court reporter charges for deposition transcript charges under 28 U.S.C. §1924." Id. at 1551. The case did not involve a Section 2(c) claim and clearly is not authority for respondent's contention that petitioner gave his implied consent to register on the facts of the present case.

In Kaplan, the Board found consent to the use and registration of the mark D.B. KAPLAN'S DELICATESSEN implicit in the terms of a "buy out" agreement. Donald Kaplan, one of the original shareholders, officers and directors of the applicant corporation, entered into a "buy out" agreement

24

that specifically provided that the mark D.B. KAPLAN'S DELICATESSEN and any mark confusingly similar thereto was the property of D.B. Kaplan's Delicatessen, Inc. and further specifically provided that Donald Kaplan could not use D. B. KAPLAN'S DELICATESSEN in any subsequent business venture. The Board held that the record supported a finding that Donald Kaplan consented to applicant's use and registration of the mark D.B. KAPLAN'S DELICATESSEN in that "Kaplan has clearly relinquished to applicant corporation all rights in the mark 'D.B. Kaplan Delicatessen' which comprises his name and has agreed that he cannot use it in any subsequent business. We think that these provisions are beyond a mere 'consent to use' situation and that a reasonable reading of this provision clearly implies that consent to applicant's registration of the mark was contemplated." Id. at 344.

In the present case, the incorporation of petitioner's business is not akin to the "buy out" agreement in Kaplan. There is no evidence that petitioner expressly stated that the mark KRAUSE PUBLICATIONS is the property of respondent. Neither did petitioner agree to refrain from use of the name Krause in any subsequent business. Petitioner's mere incorporation of his business does not constitute his written consent to that business's (i.e., respondent's) registration of the mark KRAUSE PUBLICATIONS.

In In re New John Nissen Mannequins, 227 USPQ 669 (TTAB 1985), the Board considered whether the appearance of one's name in a deed of incorporation constituted the required consent under Section 2(c). The applicant therein, John Nissen Mannequins, appealed from a final refusal to register the mark JOHN NISSEN MANNEQUINS under Section 2(c) of the Trademark Act because the mark consisted of a name identifying a particular living individual, namely John Nissen, whose written consent had not been made of record. John Nissen was a founder of the applicant's predecessor, John Nissen Mannequins. Applicant argued that John Nissen provided his written consent to register the subject mark because John Nissen's name appeared in the deed of incorporation of applicant's predecessor corporation and because applicant's use and registration of the mark in other countries showed implied consent. The Board held that neither the appearance of Mr. Nissen's name in the deed of incorporation of applicant's predecessor nor any consent implied from the issuance to applicant and applicant's predecessor of foreign registrations incorporating the name John Nissen constituted the written consent required by Section 2(c). In the present case, too, the appearance of petitioner's name in documents incorporating his business does not constitute the written consent required by Section 2(c).

There is a distinction between the right to use a name and the right to register one.  A person may give express or implied consent to the use of his name, but that does not necessarily mean that he consents to the registration of it. Thus, even if we were to find that petitioner had impliedly consented to respondent's use of his name in connection with the business as it was conducted at the time petitioner was involved with respondent, such consent would not constitute a consent to register petitioner's name as a trademark.[3]

Respondent has offered no legal support for its contention that petitioner gave his implied consent to register KRAUSE PUBLICATIONS when, as president and chairman of the board of respondent, he pledged assets of respondent, including trademarks and trade names, to finance expansion and acquisitions.  Respondent has pointed to no provisions (and we have found none) in the financing documents made of record where petitioner stated that the mark KRAUSE PUBLICATIONS is the property of respondent.  In short, the circumstances in this case are readily distinguishable from those in Kaplan.

Lastly, respondent argues that given its decades long use of the mark KRAUSE PUBLICATIONS and petitioner's silent

---

[3] On the other hand, a consent to register a name as a trademark, even without a specific reference to a consent to use, would impliedly constitute a consent to use the name, since a federal registration may not be obtained (with an exception not relevant here) or maintained without use.

27

acquiescence in that use, petitioner is estopped from challenging respondent's registration.

As the Board noted in <u>Ross</u>, supra at 1276, "in view of the personal nature of [a Section 2(c) claim], we see no overriding public policy or interest which would preclude the assertion of equitable defenses against [such a] claim." We find, however, that respondent herein has no right to raise the equitable defense of acquiescence on the facts of this case, which involves respondent's right to register the mark KRAUSE PUBLICATIONS, rather than its right to use such mark.

A predecessor to our primary reviewing Court, the Court of Customs and Patent Appeals, addressed the distinction between the right to register and the right to use in terms of acquiescence in James Burrough, Ltd. v. La Joie, 462 F.2d 570, 174 USPQ 329 (CCPA 1972). There, the applicants began use of the mark SIGN OF THE BEEFEATER for a restaurant in 1957. In 1959 and 1960 the opposer sent letters to applicants requesting that they desist from using the term BEEFEATER for their restaurant. The applicants ignored the letters and indeed expanded their business to at least six restaurants. Opposer took no further action against applicants until 1967. The Board found that opposer had acquiesced in the applicants' use of their mark. On

28

appeal, the court rejected applicant's acquiescence defense,

stating:

> We have no difficulty in concluding that the board
> erred in sustaining the applicant's equitable
> defense in this case.  In Salem Commodities, Inc.
> v. Miami Margarine Co., 44 CCPA 932, 244 F.2d 729,
> 114 USPQ 124 (1957), the appellee, applicant for
> trademark registration, urged that appellant, the
> opposer, was estopped because the applicant's use
> of the mark was known to opposer for a long period
> of time before any action was taken to stop that
> use.  The board agreed that the appellant had a
> good §19 defense to the opposition.  While this
> court proceeded on the basis that appellant's
> factual assertions were true, it nevertheless
> reversed the board's decision and held that:
>
> Appellant was clearly under no duty to attack
> appellee's right to use the mark if it did not
> choose to do so, on penalty of being deprived of
> the right to oppose an application to register.
> It could not take the latter action, of course,
> until after appellee applied for registration and
> the application was published for the purpose of
> opposition.
>
> Appellant cannot properly be charged with
> acquiescence in appellee's right to *registration*
> until appellant became aware that such a right had
> been asserted by appellee.  [Emphasis in
> original.]
>
> The court in Salem recognized a distinction
> between the right to use a mark and the statutory
> right to register which is of significance when
> § 19 is sought to be relied upon in defense to an
> opposition.  Thus, under § 7(b) of the Lanham
> Act, 15 U.S.C. 1057(b), registration is more than
> evidence of the right to use.  It is prima facie
> evidence "of the validity of the registration,
> registrant's ownership of the mark, and of
> registrant's exclusive right to use the mark in
> commerce *in connection with the goods or services
> specified in the certificate*, subject to any
> conditions and limitations stated therein."
> [Emphasis in original.]  Moreover, in the present
> case, appellant may have acquiesced only in the
> use of the words SIGN OF THE BEEFEATER in

conjunction with a picture to identify a restaurant in which no liquor is served and which closes relatively early in the evening whereas registration is sought on the words alone for "restaurant services" broadly. Applicants' equitable standing in an action by this opposer to enjoin their actual use of SIGN OF THE BEEFEATER, if ever brought, would be one matter. However, in this opposition, which is aimed only at preventing registration of the specified mark, a broader and somewhat different goal than enjoining the actual use of the mark, and which is timely brought only after the applicants seek registration, the applicants have not established this opposer's acquiescence in this registration.

It is clear, therefore, that the equitable defense of acquiescence in an opposition or cancellation proceeding does not begin to run until the mark is published for opposition. See also National Cable Television Association, Inc. v. American Cinema Editors Inc., 937 F.2d 1572, 19 USPQ2d 1424 (Fed. Cir. 1991) [laches runs from the time from which action could be taken against the trademark rights inhering from registration].

Petitioner brought this cancellation proceeding on November 22, 2002, approximately eight months after the publication date of the underlying application and six months after issuance of the registration. This relatively short period cannot be viewed as an unreasonable delay. Thus, we find that respondent has not demonstrated that petitioner's Section 2 (c) claim is barred by acquiescence.

In sum, we find that petitioner has established that, with respect to Classes 16, 35 and 42 of the subject

30

registration, the registered mark consists of the name of a particular living individual, namely Chester Krause, and that this name has been registered without his written consent.

**Decision**: The petition to cancel Registration No. 2,573,101 in Classes 16, 35 and 42 is accordingly granted, and the petition to cancel the registration in Class 41 is dismissed. Classes 16, 35 and 42 will be cancelled from the registration in due course.