**NATIONAL CABLE TELEVISION ASSOCIATION, INC., Appellant,**

v.

**AMERICAN CINEMA EDITORS, INC., Appellee.**

No. 90–1247.

United States Court of Appeals, Federal Circuit.

July 2, 1991.

**1574**

Gloria C. Phares, of Weil, Gotshal & Manges, New York City, for appellant.

Robert L. Balmuth, of Davis, DiGrazia & Balmuth, Irvine, Cal., for appellee.

Before NIES, Chief Judge, and RICH and MAYER, Circuit Judges.

NIES, Chief Judge.

National Cable Television Association, Inc. (Cable), appeals the decision of the United States Patent and Trademark Office Trademark Trial and Appeal Board, *American Cinema Editors, Inc. v. National Cable Television Assoc.*, Cancellation No. 17,-390 (TTAB Dec. 29, 1989), granting the petition of American Cinema Editors, Inc. (Editors), to cancel Cable's Registration No. 1,311,529 for the mark ACE, used since 1979, for the service of "conducting award presentation ceremonies for excellence in cable television broadcasting."

On cross-motions for summary judgment, the Board held that Editors was entitled to prevail because Editors had long prior use of, and identification with, the acronym A.C.E., as well as ACE, in the entertainment industry, including use in connection with presentations of awards for excellence in film editing for motion pictures and television, and that Cable's use of ACE for television awards ceremonies, including making awards for film editing, was likely to cause confusion. The Board additionally rejected Cable's defense that Editors was precluded from maintaining the instant action due to laches, estoppel or acquiescence in asserting its rights. We affirm.

### Issues

1. Does the record show a genuine issue of material fact with respect to Editors' asserted rights in ACE?

2. Is Cable's use of ACE as a service mark for awards ceremonies likely to be attributed to Editors?

3. Is Editors' petition for cancellation of Cable's registration barred by laches, estoppel or acquiescence?

### I

American Cinema Editors, Inc., was formed in 1951, by members of the cinema editors profession, as a nonprofit corporation for the primary purpose of advancing the art and science of film editing. Membership in Editors is by invitation only and is extended to individuals who have achieved preeminence in the art of film editing. As of April 1989, there had been only 267 individuals so selected. Members are entitled to display the acronym "A.C. E." after their names which appear, for example, in the screen credits appended to television programs and motion picture films. A mark so used by members of an organization is known as a "collective mark." *See* 15 U.S.C. § 1127 (1988).[1] In addition, the undisputed and extensive evidence of record shows that the name "American Cinema Editors" is frequently shortened to "ACE" or "the ACE" by its officers, by members, by film professionals, and in the press and that this usage began long prior to 1979.

To advance its objects and purposes, Editors has, since 1952, presented annual awards for outstanding achievement in the art of film editing. Any film editor, whether a member of Editors or not, is eligible to receive an award. The awards are made not only for motion picture film editing but also, since at least 1963, for television editing.

Editors originally called its awards the "A.C.E. Quarterly Awards." Sometime in or about 1962, Editors chose "EDDIE" as the name for its awards and also referred to them as "A.C.E. EDDIE" awards. How-

[1] The term "collective mark" means a trademark or service mark—
(1) used by the members of a cooperative, an association, or other collective group or organization, or
(2) which such cooperative, association, or other collective group or organization has a bona fide intention to use in commerce and applies to register on the principal register established by this Act,
and includes marks indicating membership in a union, an association, or other organization.

ever, others, particularly the press, have long identified them simply as "ACE AWARDS." Editors' awards are presented at a large formal dinner, attended by people in the entertainment industry, and the ceremonies are well covered by the trade papers, such as *Hollywood Reporter* and *Variety*.

National Cable Television Association, Inc., headquartered in Washington, D.C., is a trade association representing the cable television industry. In 1979, Cable initiated the presentation of annual awards in connection with cable programming, naming them "ACE" awards, an acronym for "*A* ward for *C* ablecasting *E* xcellence." In 1985, an ACE award was added for the category of film editing. That year a member of Editors, Edward Abroms, A.C.E., received such an ACE Award from Cable. Also in its 1985 promotional materials, Cable listed several members of Editors among its "ACE FINAL JUDGES," with the Editors' A.C.E. mark after each name, specifically "Bernie Balmuth, A.C.E."; "James Blakeley, A.C.E."; "John F. Burnett, A.C.E."; "Jerrold L. Ludwig, A.C.E."; and "Irving Rosenblum, A.C.E."

Cable has advertised its ACE awards in *Hollywood Reporter* and *Variety*. In a 1988 *Hollywood Reporter* ad, "ACE AWARDS" was displayed in large bold letters in the center of the ad superimposed on the names of individuals including "Edward Abroms, A.C.E." In 1989, Cable spent $1.5 million to put on a television special at which its awards were bestowed. There is no dispute that Cable's awards have been extensively promoted and have in recent years become known to a substantial part of the entertainment industry and to many television viewers.

Immediately upon learning of Cable's initiation of ACE Awards in 1979, Editors sent a letter to Cable advising them of Editors' long prior identification in the motion picture and television industry with A.C.E. and ACE in connection with film editing awards. In this letter Editors urged Cable to change the name of its award because of the conflict in identification with Editors. Cable responded by denying that its concurrent use of ACE awards would cause confusion but gave Editors its assurances that:

> [E]ach and every use it [Cable] makes of the "ACE" acronym will specifically include the following:
>
> 1. A correlation with the words "Awards for Cable-casting Excellence" from which the acronym derives, and
>
> 2. NCTA's name and logo prominently displayed therewith. Such a representative use is shown in the Attachment A enclosure to this letter.
>
> We are confident that this specific identification will eliminate the possibility of any possible false designation of origin or industry mis-association.

In late 1983, Editors sent another letter protesting Cable's use of ACE because Cable was using ACE alone and not in accordance with the above letter. Instances of actual confusion, such as phone calls to Editors inquiring about Cable's awards, were recounted. Shortly after receiving this letter, Cable filed to register ACE alone as its service mark for awards presentations and obtained the registration which is the subject of this proceeding.

Apparently unaware that Cable had registered ACE as its service mark, in 1986 an officer of Editors wrote Cable urging that it change its award name because of confusion in the industry. Cable responded that it had obtained the subject registration and that Cable did attempt to identify its ACE awards by using its organizational name with ACE "whenever possible." It stated it would continue to do so "which should help to minimize any considerable confusion with American Cinema Editors." Editors then wrote a letter of protest to the Commissioner of Patents and Trademarks, an ineffectual gesture, after which it proceeded to file a timely petition for cancellation of Cable's registration before the Trademark Trial and Appeal Board. Following discovery, both parties filed motions for summary judgment accompanied by supporting affidavits. The Board granted Editors' motion, and Cable timely appealed to this court pursuant to 28 U.S.C. § 1295(a)(4)(B) (1988).

## II

## DISCUSSION

### Summary Judgment Standard of Review

Summary judgment is appropriate where the movant has established that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562, 4 USPQ2d 1793, 1795 (Fed.Cir.1987); 37 C.F.R. § 2.116(a) (1990) (proceedings before board are governed by Federal Rules of Civil Procedure); Fed.R.Civ.P. 56. On appeal, this court reviews the question of the propriety of summary judgment *de novo*. *Action Temporary Servs., Inc. v. Labor Force, Inc.*, 870 F.2d 1563, 1565, 10 USPQ2d 1307, 1308–09 (Fed.Cir.1989) (In reviewing whether the Board correctly entered summary judgment, court reapplies standard of Fed.R.Civ.P. 56); *Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 853 F.2d 888, 890, 7 USPQ2d 1628, 1630 (Fed.Cir.1988) (same).

Editors asserts Cable is not entitled to registration of ACE for award presentations because of Editors' prior identification with A.C.E. and ACE in connection with awards. Per Editors, registration is barred by section 2(d) of the Lanham Act, 15 U.S.C. § 1052 (1988), which provides, in pertinent part,

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

\* \* \* \* \* \*

(d) Consists of or comprises a mark which so resembles ... a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive:....

There is no dispute that Editors has long prior rights in A.C.E. as a collective mark used by its members in connection with film editing. However, Cable asserts that there is a genuine issue of fact as to whether Editors had used ACE as a trade name or mark and asserts that resolution of this factual dispute is critical to granting of the motion. Per Cable, if the issue of likelihood of confusion is correctly limited to a comparison of Cable's use of ACE for awards ceremonies with the use of A.C.E. to indicate honorary membership in Editors, Cable would prevail.

### No Genuine Issue of Material Fact As To Editors' Rights in ACE

#### A.

Cable asserts that the Board held there was a likelihood of confusion only by finding Editors had rights in ACE as a trade name in addition to its rights in A.C.E. as a collective mark. Since the Board discussed both, albeit in different parts of its opinion,[2] we will assume that the ultimate decision rested on, or at least was influenced by, Editors' rights in both A.C.E. as a mark and ACE as a trade name.

Cable points to no conflict in the testimonial affidavits or in what the exhibits show. Rather it disputes that the evidence submitted by Editors is sufficient to establish rights in ACE as Editors' "trade name" prior to 1979. The term "trade name" is defined in the Lanham Act to mean "any name used by a person to identify his or her business or vocation" as distinguished from a trademark or service mark which is defined to mean a name or symbol used to identify and distinguish goods or services from those of others and to indicate the source of those goods or services. *See* 15 U.S.C. § 1127 (definitions of "trade name," "trademark" and "service mark"); 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 4:4 (2d ed.1984).

**2.** In connection with an issue of standing, the board held that Editors could reasonably believe it would be damaged and thus had standing, *inter alia*, because American Cinema Editors was publicly known as ACE. *See American Cinema Editors*, Cancellation No. 17,390, Slip op. at 4.

The evidence is profuse that Editors has publicly been known as ACE since prior to 1979, as attested to by members of Editors, as well as shown by newspaper articles and third party correspondence where the name American Cinema Editors has routinely been shortened to ACE. A typical article entitled "ACE Awards Dinner" appears in the University Film Producers' Association's publication in 1963. In the article recounting that awards dinner, the writer speaks of the "ACE membership," the "ACE president" and the "courtesy of ACE." Similar references to the organization as ACE and to ACE awards appear in numerous other exhibits, such as, correspondence to Editors from Peter Korzilius, Banquet Maitre D', Eugene B. Fleisher, Film Director at the University of Miami, and Bernard R. Kantor, Chairman of the Cinema Department at the University of Southern California. None of the underlying evidence submitted by Editors is disputed, and indeed, Cable does not dispute the identification of Editors as ACE by third parties which is clearly shown by the record.

Cable discounts such third party identification as a basis for the cancellation because under the Lanham Act "trade name" is defined to mean a name "used *by* a company," and section 2(d) speaks of a likelihood of confusion predicated on "a trade name previously used *by* another." (Emphasis added.) Cable asserts this means that Editors can acquire protectable rights only through its own use as a trade name, and it then goes on to assert that Editors has made no trade name use of ACE.

■ Turning to the latter contention first, Cable points to Editors' failure to adopt the name ACE as a trade name in its bylaws or to print ACE on its letterhead and concludes that Editors has, therefore, made no legally cognizable use of ACE as a trade name. We disagree. An organization need only to have used a name or acronym in a manner that identifies the

company by that name or acronym to the public. Editors has used ACE as a trade name for the organization within the titles and text of articles in its publications and in correspondence. Statements appear therein showing trade name use, such as, "even if ACE had been established many years before"; "belonging to ACE will always stimulate desire"; and "ACE is continuing to admit these editors." In 1971, Editors entitled a publication "ACE SECOND DECADE ANNIVERSARY BOOK." That is clearly sufficient evidence that Editors uses ACE as its trade name; no particular formality of adoption or display is necessary to establish trade name identification.

Cable disputes that Editors' examples of its own use of ACE prior to 1979 were sufficiently open and public to develop any rights. For example, Editors' ACE Decade Anniversary books, Cable asserts, are akin to college or high school yearbooks distributed only to members and not to any "public" audience. Inasmuch as the whole purpose of this inquiry into trade name rights is to determine if members of the public identify Editors by the name ACE, it makes no sense to look only at Editors' use apart from the complementary use by the public. We are not here presented with a situation where the only evidence of use *at all* of ACE as a trade name is internal—*i.e.*, concealed from public awareness. *See, e.g., El Paso Prods. Co. v. C.P. Hall Co.*, 180 USPQ 409, 412 (TTAB 1973). The evidence of record associating Editors with ACE includes undisputed evidence of such association by the public. Cable's argument that Editors' use of ACE was not sufficiently public on this record is untenable.

■ Moreover, even without use directly by the claimant of the rights, the courts and the Board generally have recognized that abbreviations and nicknames of trademarks or names used *only* by the public give rise to protectable rights in the owners of the trade name or mark which the public modified.[3] Such public use by oth-

**3.** *See* 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 7:4 (2d ed.1984), and cases cited therein; *see also American Stock Exch.,* *Inc. v. American Express Co.*, 207 USPQ 356, 363 (TTAB 1980) ("AMEX" protected); *Norac Co., Inc. v. Occidental Petroleum Corp.*, 197 USPQ

ers inures to the claimant's benefit and, where this occurs, public use can reasonably be deemed use "by" that party in the sense of a use on its behalf. In any event, as previously discussed, Editors here has itself made significant use of ACE as its trade name since prior to 1979. The record establishes without any genuine dispute that Editors is known as ACE and uses ACE and, thus, fits within the *literal* language of section 2(d), "a trade name previously used in the United States by another."

### B.

■ Cable further asserts that Editors has submitted no evidence showing the type of use or display of ACE as a service mark for awards ceremonies which would entitle Editors to a registration, and thus it concludes that Editors has shown no rights in ACE as a service mark. It is not required that Editors meet the technical statutory requirements [4] to register ACE as its mark for award ceremonies in order for Editors to have a basis for objection to another's registration. Prior public identification of petitioner with the name ACE for awards from use analogous to service mark usage is a sufficient ground for cancellation. *See Jim Dandy Co. v. Martha White Foods, Inc.,* 458 F.2d 1397, 173 USPQ 673 (CCPA 1972) (use of a term as advertising slogan sufficient to defeat a right of registration of mark by another); *see also American Stock Exch.,* 207 USPQ

at 363 (opposition may be based on use of term in manner analogous to trademark use, such as "in advertising, use as a grade mark, use as the salient or distinguishing feature of a trade name, use of an acronym or the initial letters of a corporate name, etc."). The record before us discloses numerous newspaper articles and other references to Editors' awards as "ACE AWARDS" since the 1950's, as well as evidence of Editors' own use of ACE in connection with its award ceremonies since that time. Whether such usage is deemed analogous to service mark use or further use of its trade name in connection with awards is not material. The wide-spread use by persons in the entertainment industry confirms that the acronym ACE is strongly associated with Editors and its achievement awards.[5]

### C.

■ That Editors has an undisputed prior right to the collective membership mark A.C.E. and that the public has identified ACE as Editors' trade name and as the name of its awards are sufficient to support its prior rights in both terms in connection with film editing awards and related activities of promoting and recognizing excellence in film editing. Thus, we turn to the question whether Cable's use of the mark ACE for awards would likely be attributed to Editors.

306, 315 (TTAB 1977) (earlier use of "OXY" by public determined priority); *Volkswagen A.G. v. Thermo–Chem Corp.,* 185 USPQ 561 (TTAB 1975) ("BUG" nickname for automobile); *Pieper v. Playboy Enter., Inc.* 179 USPQ 318, 320 (TTAB 1973) ("BUNNY CLUB" protected); *Coca–Cola Co. v. Busch,* 52 USPQ 377 (D.C.Pa.1942) ("COKE" for soft drink).

**4.** For instance, one criterion for registrability is "use in commerce" as defined in 15 U.S.C. § 1127. *See Larry Harmon Pictures Corp. v. Williams Restaurant Corp.,* 929 F.2d 662, 18 USPQ2d 1292 (Fed.Cir.1991); *In re Mother Tucker's Food Experience (Canada) Inc.,* 925 F.2d 1402, 17 USPQ2d 1795 (Fed.Cir.1991). Were failure to show "use in commerce" a bar to petitioning for cancellation of a registration, a party could never cancel a mark based solely on intrastate use. This is not the law. Section

14 requires only prior use; "in commerce" is noticeably absent. *See, e.g., Hess's of Allentown, Inc. v. National Bellas Hess, Inc.,* 169 USPQ 673, 677 (TTAB 1971) (Prior use of mark in intrastate commerce sufficient to sustain petition for cancellation based on likelihood of confusion with that mark); *Plymouth Cordage Co. v. Solar Nitrogen Chem., Inc.,* 152 USPQ 202, 204 (TTAB 1966) (same).

**5.** Cable characterized its argument that Editors has insufficient prior rights in ACE as a trade name or service mark as an issue of Editors' lack of standing to petition for cancellation of Cable's registration on the basis of likelihood of confusion with that term. Our decision that Editors has prior rights in ACE as a trade name subsumes any argument over standing. *See Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

## Likelihood of Confusion

■ Editors successfully maintained before the Board that because of the close relationship between Cable's award presentations and Editors' award activities, concurrent use of ACE and/or A.C.E. by these parties would likely cause confusion. Cable first asserts that ACE is a "weak" mark because uses of ACE by unrelated companies are widespread on numerous types of goods and services and in trade names. Thus, per Cable, the Board erred in discounting this evidence on the grounds that "there is no evidence that such marks [other ACE marks] are used in connection with people or the activities of people in the field of editing in the entertainment industry." *American Cinema Editors*, slip op. at 8.

■ Cable is correct that the presence of numerous unrelated uses of a mark may be a significant factor in determining likelihood of confusion with another user of the same or virtually the same mark. *In re E. I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973). However, Cable's leap to a conclusion that all the third party names and marks in evidence here are relevant ignores the rationale underlying this factor.

Where a mark is commonly used on numerous types of goods and services by different companies, a term such as PREMIUM, SUN, BLUE RIBBON, NATIONAL, GIANT or AMERICAN, it may be reasonable to infer in some situations that purchasers have been conditioned to expect different sources for specifically different goods or services even though such goods or services might be deemed sufficiently related to be attributable to a single source under an uncommonly used mark. *Compare Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259–60, 205 USPQ 969, 975–76 (5th Cir.) (no confusion likely between DOMINO for sugar and DOMINO for pizza services in presence of third party use), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980) *with In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467 (TTAB 1988) (confusion likely between restaurant services and a mustard sold under MUCKY DUCK mark with no presence of third party use). This is not because of some kind of mechanically applied rule, but because the determination of likelihood of confusion involves, to the extent possible, an evaluation of what happens in a real world setting. *Matsushita Elec. Indus. Co., Ltd. v. National Steel Construction Co.*, 442 F.2d 1383, 1385, 170 USPQ 98, 99 (CCPA 1971). The real world segment of the public is limited to the market or universe necessary to circumscribe purchasers or users of products or services like those being offered by the parties under the "common" mark. Only if other offerings under the "common" mark are also directed to that relevant public is it reasonable to infer that they may have become conditioned to draw fine lines between sources of "related" goods or services. Thus, in the relevant market or universe, even a "common" mark may stand alone, but for the single newcomer, and there is simply no basis for an inference that the "public" has been conditioned to distinguish between sources of related products or services.

To take an extreme example, ACE for canned, large peas could not escape likelihood of confusion with a prior use of ACE for canned, small peas because ACE is concurrently used by unrelated third parties on aircraft, clothing, computer services, hardware or even bread, bananas, milk and canned carrots. Properly defined, the relevant public in the example need be defined no broader than purchasers of canned peas, and the third party ACE marks outside the segment become essentially irrelevant. While ACE for peas is "weak" in that a right to prevent use of ACE on "related" products in the food industry is highly doubtful due to its "commonness", such rights are not so limited as to be nonexistent except for an identical use. As stated in *Matsushita* in finding likelihood of confusion between uses of NATIONAL in a cancellation proceeding:

> Neither trademarks nor the public are adequately protected unless decisions in cases of this kind are based on a realistic appraisal of the likelihood of purchasers

## 1580

or prospective purchasers being confused as to source regardless of theoretical "weakness" of a mark.

442 F.2d at 1385, 170 USPQ at 99.

The facts here present a situation very much like different kinds of canned peas but without any third party marks on foods. None of the third party marks and uses of ACE made of record are nearly as closely related to the activities of the parties as the virtually identical uses of the parties are to each other. Thus, we agree with the Board that nothing in the record shows a narrowing of Editors' identification with A.C.E./ACE by third party marks with respect to the relevant public, namely, the film industry or even the broader entertainment industry. In sum, Cable's argument that it can use ACE because ACE is a "weak" mark, as an abstract proposition, is not only unpersuasive but essentially meaningless. *See Eclipse Assocs. Ltd. v. Data Gen. Corp.,* 894 F.2d 1114, 1119, 13 USPQ2d 1885, 1888–89 (9th Cir.1990) (deposition testimony describing third party users of mark ECLIPSE properly excluded where such uses on goods and services unrelated to computer field).

Cable's argument that the marks of the parties A.C.E. and ACE are different in appearance requires little attention. As previously discussed, the record shows that Editors does not always use periods and is not limited to asserting likelihood of confusion with A.C.E. alone.

■ Cable mechanically proceeds through the litany of other factors set out in *In re E. I. DuPont,* 476 F.2d at 1361, 177 USPQ2d at 567, in an effort to show a distinction between the two uses which would lead away from the conclusion that there exists a likelihood of confusion. It points to its wider viewing audience, the sophistication of Editors' members, Cable's alleged good faith, and that Cable itself has not encountered any instance of actual confusion. None of these factors outweighs the virtual identity in the use each party makes of ACE or A.C.E. and the extensive evidence that Cable's ACE awards are widely misassociated with Editors.

We find the conclusion inescapable that Cable's use of ACE for awards ceremonies is likely to cause confusion with Editors because of Editors' prior use and identification with the name ACE and the mark A.C.E. in connection with closely related activities.

### Laches, Estoppel, and Acquiescence

■ The defense of laches in a trademark proceeding recognized under 15 U.S.C. § 1069 requires a showing of undue delay in asserting rights against a claimant to a conflicting mark and prejudice resulting therefrom. *See Ralston Purina Co. v. Midwest Cordage Co.,* 373 F.2d 1015, 1018–19, 153 USPQ 73, 75–76 (CCPA 1967). Cable argues that Editors is barred by laches in objecting to Cable's registration of ACE for service awards because of Editors' longtime knowledge of Cable's use of ACE which Cable relied upon to its prejudice by building up and promoting ACE for its ACE awards. Cable asserts that since it adopted the mark ACE in 1979 and the undisputed evidence indicates that Editors had knowledge of Cable's use at least by May 31, 1979, the date of Editors' initial protest to Cable about the use of ACE, that Editors should have brought a civil action sometime shortly after that date. Failure to do so, per Cable, amounts to Editors' acquiescence in its use.

The elements of the defense of laches in *inter partes* proceedings, sometimes also characterized as "acquiescence," had an inconsistent and confused career before our predecessor, the Court of Customs and Patent Appeals, and the Board. *See* 1 J. McCarthy, § 20:11A. In *Salem Commodities, Inc. v. Miami Margarine Co.,* 244 F.2d 729, 732, 114 USPQ 124, 126–27 (CCPA 1957), our predecessor court rejected the rationale that laches runs against a party from the date that party knew of the use of the mark by the applicant or registrant. The court stated therein:

It is true that a registration on the principal register is recognition of the registrant's right to use its mark, but it is substantially more than that.

\*     \*     \*     \*     \*     \*

Appellant was clearly under no duty to attack appellee's right to use the mark if it did not choose to do so, on penalty of being deprived of the right to oppose an application to register. It could not take the latter action, of course, until after appellee applied for registration and the application was published for the purpose of opposition.

*Id.;* 224 F.2d at 732, 114 USPQ at 126. Again, in *James Burrough Ltd. v. LaJoie,* 462 F.2d 570, 572–73, 174 USPQ 329, 330–31 (CCPA 1972), the court adhered to the position taken in *Salem Commodities.*

■■■■ The Board, nevertheless, has continued to assess the merits of the laches defense from the date of knowledge of another's use of a mark. *See, e.g., Hitachi Metals Int'l. Ltd. v. Yamakyu Chain Kabushiki Kaisha,* 209 USPQ 1057 (TTAB 1981). In so doing, the Board has placed primary reliance on two intervening opinions of our predecessor court, *W.E. Bassett Co. v. Scholl Mfg. Co., Inc.,* 388 F.2d 1014, 156 USPQ 244 (CCPA 1968) and *Palisades Pageants, Inc. v. Miss America Pageant,* 442 F.2d 1385, 169 USPQ 790 (CCPA), *cert. denied,* 404 U.S. 938, 92 S.Ct. 269, 30 L.Ed.2d 251 (1971). In those cases, while laches was rejected on the basis of the particular facts, nevertheless, the court appeared to accept the standard applied by the board, albeit with little or no analysis. *Bassett,* 388 F.2d at 1016–18, 156 USPQ at 246–47; *Palisades Pageants, Inc.,* 442 F.2d at 1389, 169 USPQ at 793. When an issue is not argued or is ignored in a decision, such decision is not precedent to be followed in a subsequent case in which the issue arises. *Webster v. Fall* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (Citations omitted)); *UMC Elecs. Co. v. United States,* 816 F.2d 647, 654, 2 USPQ2d 1465, 1470 (Fed.Cir.1987) (premise assumed in earlier cases rejected when issue squarely presented), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988); 1B *Moore's Federal Practice* ¶ 0.402[2] (2d ed.1984). We conclude there is no precedent which requires us to determine laches in an opposition or cancellation proceeding under a standard based on the time running from knowledge of use rather than knowledge of the application for registration.[6] To clarify the law, we reject the Board's standard definitively now and reaffirm the position taken in *James Burrough Ltd. v. LaJoie,* which addresses the precise issue.

Logically, laches begins to run from the time action could be taken against the acquisition by another of a set of rights to which objection is later made. In an opposition or cancellation proceeding the objection is to the rights which flow from registration of the mark. *See, e.g.,* 15 U.S.C. § 1065 (incontestability of right to use mark); § 1072 (registration as constructive notice of claim of ownership); § 1115 (registration as evidence of exclusive right to use mark). Moreover, an objection to registration does not legally equate with an objection to use, that is, a charge of infringement. *See Homemakers, Inc. v. Chicago Home for the Friendless,* 169 USPQ 262, 263 (7th Cir.) (cancellation proceeding before board in itself is not a charge of infringement; therefore no basis for bringing declaratory judgment action under 28 U.S.C. § 2201 for declaration of noninfringement), *cert. denied,* 404 U.S. 831, 92 S.Ct. 70, 30 L.Ed.2d 60 (1971); *Topp–Cola Co. v. Coca–Cola Co.,* 314 F.2d 124, 125–26, 136 USPQ 610, 611–12 (2d Cir.1963) (same re opposition); *see generally Windsurfing Int'l, Inc. v. AMF, Inc.,* 828 F.2d 755, 758, 4 USPQ2d 1052, 1055 (Fed.Cir.1987) (No declaratory judgment action for cancellation of mark absent at least threat of suit for infringement). Under the view that laches runs from knowledge of use, a trademark owner would be

---

6. In this connection, we have noted the decision in *Georgia–Pacific v. Great Plains Bag Co.,* 614 F.2d 757, 204 USPQ 697 (CCPA 1980). There, after holding there was no likelihood of confusion between the marks in issue in the cancella-tion proceeding, the court went on to hold that "estoppel" by reason of laches barred the action. This holding not only was unnecessary but also the issue here was not addressed.

obligated to bring suit to stop *use* upon learning of a possible conflicting mark or suffer the possibility of being barred by the passage of time from later opposing or cancelling *registration* of the mark. We see nothing in logic or the statute which requires this expansive view of laches. As illustrated by the facts in this case, often it cannot be known immediately how a junior user will proceed to develop, display, or even change what it claims as its mark.

Thus, in this case laches, with respect to protesting the issuance of the registration for the mark, could not possibly start to run prior to October 16, 1984, when Cable's application for registration was published for opposition. The burden was, therefore, on Cable to establish both unreasonable delay and prejudice from the delay since 1984. *See Ralston Purina Co.*, 373 F.2d at 1018–19, 153 USPQ at 75–76. We conclude that Cable has failed to put forth evidence which could possibly carry that burden. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (To avoid a grant of summary judgment, "there must be sufficient evidence on which [a] jury could reasonably find for [that party].")

Further, there are no genuine issues of material fact that preclude rejecting the defense of estoppel which requires an affirmative act by Editors on which Cable relied to its detriment. *See MCV, Inc. v. King–Seeley Thermos Co.*, 870 F.2d 1568, 1571, 10 USPQ2d 1287, 1290 (Fed.Cir.1989). Cable attempts to support its assertion of estoppel with the fact that several A.C.E. members have served as judges for its awards. That members acting as individuals cooperated with Cable cannot be attributed to Editors, and Cable points to no affirmative act of Editors which could create an estoppel.

These defenses fail as a matter of law and for want of sufficient evidence to create a genuine issue of material fact.

## III

### CONCLUSION

The record here evidences an increasing encroachment on the rights of Editors by Cable, most recently by an extensive promotional program for Cable's ACE awards. Regardless of the amounts Cable expended to popularize its ACE Awards, we can reach no other conclusion but that it acted at its peril. If we assume, as Cable asks us to, that its ACE awards have become better known than Editors', it still cannot prevail. In essence, we would have to hold that "Might makes right." On the contrary, the appropriate adage is that a latecomer acts at its peril in promoting and investing in a mark which impinges on the rights of another. *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372, 195 USPQ 417, 423 (10th Cir.1977), *cert. dismissed*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

We conclude that American Cinema Editors, as the prior user of the mark A.C.E. and of the trade name ACE which is associated with awards in film editing, is entitled to cancellation of Registration No. 1,311,-529 issued to National Cable Television Association for ACE as a service mark for conducting award presentation ceremonies for excellence in cable television broadcasting on the ground of likelihood of confusion.

AFFIRMED.