# United States Court of Appeals for the Federal Circuit

———————————————

**OMAHA STEAKS INTERNATIONAL, INC.,**
*Appellant*

**v.**

**GREATER OMAHA PACKING CO., INC.,**
*Appellee*

———————————————

2018-1152

———————————————

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in Nos. 91213527, 92059455, 92059629.

———————————————

Decided: November 15, 2018

———————————————

NORA MARIE KANE, Omaha Steaks International, Inc., Omaha, NE, argued for appellant.

I. STEPHEN SAMUELS, Samuels & Hiebert, LLC, Boston, MA, argued for appellee.

———————————————

Before PROST, *Chief Judge,* O'MALLEY and STOLL,
                *Circuit Judges.*

PROST, *Chief Judge.*

Omaha Steaks International, Inc. ("Omaha Steaks")
appeals a decision of the Trademark Trial and Appeal
Board ("Board") dismissing its opposition (No. 91213527)
to Greater Omaha Packing Co., Inc.'s ("GOP") application
to register the mark "GREATER OMAHA PROVIDING
THE HIGHEST QUALITY BEEF" ("Opposed Mark") for
meat, including boxed beef primal cuts.  The Board con-
cluded that there is no likelihood of confusion between the
Opposed Mark and Omaha Steaks' previously registered
trademarks.  We conclude that the Board made certain
errors while analyzing the fame of the registered mark,
third-party usage, and similarity of the marks.  Accord-
ingly, we vacate and remand.

BACKGROUND

I

Appellant began as Table Supply Meat Company in
1917.  Around 1959, Appellant started doing business as
Omaha Steaks.  Omaha Steaks acquires "subprimals," or
larger cuts of meat (such as the loin or bovine loin), for
further processing.  It cleans them up, takes the tendons
off, and packages the processed meat for sale under an
Omaha Steaks mark.

Omaha Steaks has over two-dozen registrations for
Omaha Steaks marks.  All of those registrations include
the words "Omaha Steaks."

According to Mr. Todd Simon, Omaha Steaks' senior
vice president of sales and marketing, the company spent
over $45 million in 2011, and over $50 million in 2012 and
2013, on domestic advertising of its beef products.  Omaha

Steaks advertises its products through national radio, television, and freestanding print campaigns.

Omaha Steaks has been featured in national newspapers, magazines, television shows, and movies. It further promotes its products via catalog and direct mail, a daily blast e-mail, customer calls, and on social media platforms, including Twitter, Instagram, Pinterest, and Facebook. The direct mail advertising program operates on a rotating basis, soliciting about 2 million customers throughout the year.

Omaha Steaks has seventy-five retail stores as well as two airport kiosks. It sells its products online via Amazon as well.

## II

In 1920, GOP's predecessor was formed as an unincorporated company in Omaha, Nebraska called Greater Omaha Packing Company. In 1956, the owners formed Greater Omaha Packing Co., Inc. at the same location. GOP sells boxed beef, which is beef fabricated from whole carcasses. It is sold to wholesalers, such as hotels, restaurants, and food service institutions. GOP has continuously sold beef to Omaha Steaks from 1966 to the present.

On April 8, 2013, GOP filed an application to register the mark "GREATER OMAHA PROVIDING THE HIGHEST QUALITY BEEF" and design (Serial No. 85/897,951). The application was for the following goods in International Class 29: "meat, including boxed beef primal cuts."

The mark and design appear as follows:



III

On November 15, 2013, Omaha Steaks filed an opposition against the GOP mark and design. Omaha Steaks alleged that the Opposed Mark was likely to cause confusion in consumers' minds as to the source of the goods due to its similarity to the registered Omaha Steaks marks.

On September 30, 2017, the Board dismissed the opposition. The Board concluded there was no likelihood of confusion between GOP's Opposed Mark and Omaha Steaks' marks. To arrive at that result, the Board found inter alia that (1) Omaha Steaks did not show that its marks are famous, (2) third-party use shows that the word "Omaha" may indicate geographic location rather than a single commercial source, and (3) the differences between the GOP and Omaha Steaks marks outweigh their similarities. Omaha Steaks appeals the Board's decision.

We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

DISCUSSION

Omaha Steaks challenges three aspects of the Board's conclusion that there is no likelihood of confusion. First, Omaha Steaks contends that the Board ignored evidence of the fame of its marks under the fifth *DuPont* factor. Second, Omaha Steaks argues that the Board relied on a much broader range of goods lacking any similarity to meat products when evaluating the sixth factor, which examines the number and nature of third-party uses of similar marks on "similar goods." Third, Omaha Steaks contends that the Board's analysis of the similarity between the parties' marks was flawed because it ignored the word "BEEF" in GOP's slogan, "PROVIDING THE HIGHEST QUALITY BEEF."

I

We review the Board's legal conclusions de novo and its factual findings for substantial evidence. *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003).

Pursuant to 15 U.S.C. § 1052(d), the U.S. Patent and Trademark Office ("PTO") has authority to refuse to register an applicant's mark where it is so similar to a previously registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion." Whether a likelihood of confusion exists between an applicant's mark and a previously registered mark is determined on a case-by-case basis, aided by application of the thirteen *DuPont* factors. *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1349 (Fed. Cir. 2011); *see also In re E. I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) (reciting factors).

"Each of the *DuPont* factors presents a question of fact, findings with regard to which we test for substantial evidence when called into question on appeal." *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1370 (Fed. Cir. 2002). However, we review the Board's overall determination of likelihood of confusion without deference. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1366 (Fed. Cir. 2012).

II

There are three parts to Omaha Steaks' challenge to the Board's conclusion that its Omaha Steaks marks are not famous. First, Omaha Steaks argues the admitted evidence confirms the fame of its marks. Second, it contends that the Board inappropriately excluded the Poret survey, which evidenced consumer recognition of its marks. Third, it asserts that the Board abused its discretion by refusing to take judicial notice of its trademark lawsuits, which demonstrate fame given that others are imitating its marks. We address each argument in turn.

A

Omaha Steaks argues that the Board improperly rejected its advertising expenditures and sales figures as evidence of the fame of its marks. A mark "with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark." *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992). "Direct evidence of fame, for example from widespread consumer polls, rarely appears in contests over likelihood of confusion." *Bose*, 293 F.3d at 1371. Instead, "the fame of a mark may be measured indirectly, among other things, by the volume of sales and advertising expenditures of the goods traveling under the mark, and by the length of time those indicia of commercial awareness have been evident." *Id.*

The Board acknowledged that Omaha Steaks spent over $45 million in 2011 to advertise its beef products. That number increased to over $50 million in 2012 and 2013. J.A. 37. Furthermore, the Board determined that during the December holiday season Omaha Steaks processes 100,000 orders per day. J.A. 26–27. The Board, however, concluded that these "raw" figures lacked context and therefore disregarded them. *See* J.A. 39.

Omaha Steaks contends that contrary to the Board's analysis, it did not rest on these figures alone. Rather, it introduced evidence to contextualize these figures, including testimony about how Omaha Steaks promoted its products to the public through catalogs, direct mailings, e-mail marketing, customer calls, tradeshows, retail stores, national television, radio, magazine and newspaper campaigns, digital marketing, and social media.

GOP does not respond directly to Omaha Steaks' argument. Instead, it quotes large swaths of the Board's opinion. To the extent the quoted passages relate to evidence of ad expenditures and sales, GOP cites to the Board's application of *Bose*. The Board concluded that

while these sales figures "appear impressive," Omaha
Steaks has not provided "any context for them, i.e., how
they translate into evidence of market share for Plaintiff's
goods." J.A. 39.

The Board misreads *Bose*. The Board interpreted
*Bose* to require evidence of resulting "market share." Our
holding was not so narrow. Market share is but one way
of contextualizing ad expenditures or sales figures. *See
Bose*, 293 F.3d at 1375 ("The Board suggested that one
form of such context would be the substantiality of the
sales or advertising figures for comparable types of prod-
ucts."). Though *Bose* expressly approves of using market
share, it does not require it. *See id.* (discussing other
contextual evidence such as "general reputation" of
marked product).

*Bose* simply concluded that in light of modern advertis-
ing, "raw numbers *alone* in today's world may be mislead-
ing." *Id.* (emphasis added). *Bose* explained that
understanding the type of advertising was key to contex-
tualizing the numbers to arrive at a proper understanding
of whether customers would recognize the mark. For
example, "a 30-second spot commercial shown during a
Super Bowl football game may cost a vast sum, but the
expenditure may have little if any impact on how the
public reacts to the commercial message." *Id.* At the
other end of the spectrum, "handbills passed at little cost
to millions of consumers (for example, to New Yorkers
exiting subway stations) may amount to the kind of
advertising that is probative of consumer recognition of a
mark." *Id.*

Here, as the Board's own factual findings confirm,
Omaha Steaks provided considerable contextual evidence
of the type of advertisements and promotions it uses to
gain sales. Specifically, Omaha Steaks senior vice presi-
dent of sales and marketing, Mr. Simon, testified that it
markets and sells its Omaha Steaks' products via:

- catalog and direct mail, a daily blast email, customer calls, and on social media platforms, including Twitter, Instagram, Pinterest, and Facebook, where it has over 300,000 followers. J.A. 37 (citing J.A. 747 (Simon testimony)).

- a direct mail advertising program operating on a rotating basis with about 2 million customers that are solicited throughout the year. *Id.* (citing J.A. 740 (Simon testimony)).

- national radio and television campaigns, free-standing print campaigns, and mention in national magazines, including *Time, Newsweek, Playboy,* and *PC Magazine,* and newspapers, including *USA Today,* the *Wall Street Journal,* the *New York Times,* and the *LA Times.* *Id.* (citing J.A. 739–47, 801 (Simon testimony)).

- TV promotions of goods and services under the Omaha Steaks mark on the following TV shows: "Fox & Friends," "Hell's Kitchen," "Celebrity Apprentice," and "The View." *Id.* (citing J.A. 749–50 (Simon testimony)).

- features of Omaha Steaks products on "The Oprah Winfrey Show," "The Ellen DeGeneres Show," "Food Factory," "Unwrapped," and "Military Makeover." *Id.* (citing J.A. 750–51, 754 (Simon testimony)).

- unsolicited movie and TV allusions to Omaha Steaks. *See, e.g.*, J.A. 38 (citing J.A. 774–76 (Simon testimony) (discussing mentions in "Dodgeball," "Flipper," "The West Wing," "Seinfeld," "The George Lopez Show," and "Dennis Miller Live")).

- seventy-five stores in twenty-five states, including New York, Illinois, Florida, Georgia, Ohio, Kentucky, Missouri, Nebraska, Califor-

nia, Colorado, Nevada, Arizona, Texas, Pennsylvania, and New Jersey, as well as two kiosks at the Omaha airport. *Id.* (citing J.A. 739 (Simon testimony)).

- appearances of Omaha Steaks' kiosks in nationally released films, including "Up in the Air" and "About Schmidt." *Id.* (citing J.A. 774 (Simon testimony)).

The Board's fact-findings above confirm that due to Omaha Steaks' sales and marketing efforts, the consuming public has been regularly exposed to Omaha Steaks' marks on a nationwide scale. Based on this undisputed record, the Board's conclusion that Omaha Steaks did not provide any context for its "raw" sales figures and ad expenditures lacks substantial evidence.

Relatedly, GOP also appears to argue that Omaha Steaks' evidence of fame should be disregarded because the record does not include copies of the underlying advertisements. The Board emphasized that Omaha Steaks "provided no examples of its advertising content showing how the OMAHA STEAKS marks are used across the various referenced media, or any other evidence corroborating Plaintiff's testimony." J.A. 40. In the Board's view, such evidence was necessary to understand whether the marks were "being displayed in a manner that leads to widespread recognition." *Id.*

In *Bose*, such granular detail was necessary given the nature of the marks. Specifically, there was a dispute as to whether the Bose marks at issue—ACOUSTIC WAVE and WAVE—were well-recognized as freestanding marks, or depended on the fame of the already famous BOSE "house mark" in the same ads. *Bose*, 293 F.3d at 1374–75. In turn, that case demanded a careful examination of the ads' content. *Id.* at 1375 ("In this case, the sales and advertising numbers for ACOUSTIC WAVE and WAVE have to be seen both in the context of how the products

are presented in the advertising and sales material (here with sufficient independence from the famous house mark) and in the context of the continuous and extensive critical consideration the marked products have enjoyed.").

Here, the need to comb through the content of the ad to parse out the level of recognition attributable to a freestanding mark is not present. It is undisputed that the tradename "Omaha Steaks" and related uses in its marks are what is being promoted, not a separate brand merely associated with its house mark. As counsel for Omaha Steaks pointed out during oral argument—and GOP did not dispute—every registered mark submitted here includes the phrase "Omaha Steaks."

In light of the direct overlap between the company's name and its marks, it is undisputed that an Omaha Steaks ad involved either its registered tradename, "OMAHA STEAKS," or one of its registered trademarks displaying that name. Indeed, in several instances, the Board's own findings also expressly describe the use of an Omaha Steaks trademark in promotional appearances on national television and in major public venues. *See, e.g.*, J.A. 37 ("Todd Simon has personally promoted Plaintiff's goods and services *under the Omaha Steaks mark* on the following television shows: 'Fox & Friends,' 'Hell's Kitchen,' 'Celebrity Apprentice' and 'The View.'" (emphasis added)); J.A. 38 ("Omaha Steaks' goods and services are promoted *under the Omaha Steaks mark* through concessions, and some signage, at venues in Omaha, e.g., the CenturyLink Center arena, TD Ameritrade Park, Ralston arena, Storm Chasers Stadium and the Omaha Henry Doorly Zoo." (emphasis added)).

In GOP's view, the Board correctly reasoned that because it cannot discern which particular "Omaha Steaks marks" are being advertised, it can end the inquiry as to the fame of Omaha Steaks marks. This view ignores the

larger body of evidence here—and the Board's own factual findings—that the tradename Omaha Steaks and related marks were appearing in a broad spectrum of national media, backed by millions of dollars of advertising, which correlated with millions of dollars of sales. While the precise content of certain advertisements may have strengthened the record regarding fame, the Board's decision to essentially disregard Omaha Steaks' testimonial evidence of its advertising goes too far.

Therefore, we agree with Omaha Steaks that the Board's decision to discount this evidence of fame was legally flawed. In light of our holding in *Bose*, the Board took an overly restrictive view of evidence related to Omaha Steaks' sales figures, advertising expenditures, and related evidence of the relevant public's exposure to its branded meat products bearing on the relative fame of the mark. Accordingly, we vacate and remand to allow the Board to conduct a proper analysis of this factor.

B

Omaha Steaks next contends that a survey conducted by its expert, Mr. Hal Poret, further evidenced fame and was improperly disregarded. The Board found the expert's survey questions were self-servingly directed to a narrow universe of respondents, exclusively comprised of Omaha Steaks' customer base. *See* J.A. 21. In Omaha Steaks' view, even if the survey does not target what the Board considers to be the optimal universe, the results are so compelling that it still supports the factual finding that a majority of consumers recognize the Omaha Steaks marks and associate them with a single source of meat.

Such evidentiary rulings are reviewed for abuse of discretion. *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1390–91 (Fed. Cir. 2010) (reversal appropriate only if evidentiary ruling was: (1) "clearly unreasonable, arbitrary, or fanciful"; (2) "based on an erroneous conclusion[] of law"; (3) premised on "clearly erroneous findings

of fact"; or (4) unsupported by the record, which "contains no evidence on which the Board could rationally base its decision"). We see no abuse of discretion here.

There is no dispute that the relevant goods for the marks at issue are identified broadly as "meat" and "beef." J.A. 21–22. The Board concluded that "the relevant public would comprise ordinary consumers who eat meat and beef, not just Plaintiff's current customer base." J.A. 22. Despite this broad relevant public, Mr. Poret deliberately excluded a large segment of these consumers. Omaha Steaks does not challenge the Board's factual finding, based on Mr. Poret's deposition testimony, that participants "who responded that they purchased their meat through an online grocery store, a big chain or local grocery store or a supermarket or smaller market were excluded." J.A. 21 n.20.

As a result, the Board concluded that by intentionally eliminating such "a large segment of meat eaters because they purchase their meats from grocery stores and markets, and not specialty kiosks and websites" like Omaha Steaks' customers, Mr. Poret "fatally narrow[ed]" the survey universe and skewed the results. J.A. 22. We agree. It was not an abuse of discretion to conclude such unreliable evidence lacks probative value.[1]

---

[1]    Omaha Steaks also argues that the Tenth Circuit refused to reject survey results under similar circumstances in *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 n.6 (10th Cir. 1987). However, *Brunswick* is distinguishable. There, the inclusive survey covered "persons over 14 years who have fished in fresh water in the last twelve months." *Id.* The Tenth Circuit concluded the trial court did not abuse its discretion by admitting the survey, especially since there was "no evidence to show that such a universe would not be a fair sample of

C

Omaha Steaks next argues that the Board improperly refused to take judicial notice of its various trademark lawsuits. In Omaha Steaks' view, the need to stop imitation evidences fame. To that end, Omaha Steaks provided the Board with case captions to show it "filed numerous lawsuits against perceived infringers." J.A. 22. The Board, however, concluded that Omaha Steaks failed to supply the necessary information to support its request for judicial notice. Namely, Omaha Steaks did not provide "any material, e.g., the pleadings, to substantiate its claim" regarding the other lawsuits. J.A. 23.

Under Federal Rule of Evidence 201(b)(2), a tribunal "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A tribunal "must take judicial notice if a party requests it" and "the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

On appeal, GOP does not meaningfully dispute the factual substance of Omaha Steaks' request—i.e., it filed around twenty lawsuits "against perceived infringers." Nor does it dispute that this fact can be readily determined from the dockets of those actions, which are publicly accessible via PACER. And it does not contest that the only information the Board needed to access these records was the caption Omaha Steaks provided for each case. Finally, GOP does not reasonably question the accuracy of these records.

---

those who are likely to purchase spincast reels." *Id.* By contrast, here the undisputed facts confirm the Poret survey did not come close to providing a reliable sample of consumers likely to purchase meat.

GOP's only argument on appeal is that Omaha Steaks did not affirmatively provide the Board with copies of the actual reported decisions and related documents in the dockets to prove it filed these suits. GOP cites no authority, however, that a party must provide an underlying copy of a publicly available court record where it has provided the citation necessary to allow the court to access that record.

To the extent Omaha Steaks was asking the Board to take judicial notice of the mere fact that it had filed numerous infringement actions, providing the relevant case captions, including the case names and docket numbers, was likely sufficient. *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) ("[A] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992))). But, the mere fact that lawsuits were filed is not reasonably probative of the fame inquiry, which is focused on whether the mark has achieved "extensive public recognition and renown," *Coach Servs.*, 668 F.3d at 1367, not on enforcement efforts. Any error in refusing to take judicial notice of the case filings was thus harmless.[2]

To the extent Omaha Steaks was asking the Board to take judicial notice of the contents of the complaints filed in those cases, the fact that the cases related to the mark at issue here, or that others were actively infringing

---

[2]     Indeed, given the limited significance of these other lawsuits to the fame inquiry, counsel for Omaha Steaks conceded at oral argument that any error in the Board's decision not to take judicial notice was harmless. Oral Arg. at 33:29–56, No. 2018-1152, http://www.cafc.uscourts.gov/oral-argument-recordings.

Omaha Steaks' asserted mark, we find no abuse of discretion in the Board's denial of that request. The Board is not required to scour, not just the dockets, but the multiple pleadings referenced in those dockets to determine the substance of the litigations referenced. Under the circumstances of this case, we cannot say the Board abused its discretion in failing to take judicial notice.

## III

Omaha Steaks next challenges the Board's analysis of the sixth *DuPont* factor regarding third-party usage. This factor considers "[t]he number and nature of similar marks in use on similar goods." *DuPont*, 476 F.2d at 1361. The purpose of introducing evidence of third-party use is "to show that customers have become so conditioned by a plethora of such similar marks that customers 'have been educated to distinguish between different [such] marks on the bases of minute distinctions.'" *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1374 (Fed. Cir. 2005) (quoting *Veuve Clicquot Ponsardin Maison Fondee en 1772 v. Palm Bay Imps., Inc.*, Opp'n No. 115,438, 2003 WL 21953664, at *10 (TTAB Aug. 4, 2003)). Third-party use is "relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." *Id.* at 1373.

In Omaha Steaks' view, the Board improperly broadened its analysis to encompass third-party marks on clearly dissimilar goods. The Board determined that the "goods" in GOP's application ("meat, including boxed beef primal cuts") were legally identical to those in Omaha Steaks' pleaded registration ("meat"). J.A. 34. Nonetheless, the Board considered a variety of services and products that include the word "Omaha," regardless of whether they involve meat. The Board then concluded that while this evidence is "not overwhelming, it is sufficient" to find that the designation OMAHA "may be

perceived as an indication of the geographic location of the producer of the goods or the geographic origin of the goods themselves." J.A. 45. Based on this finding, the Board determined that "OMAHA" is weak as an indicator of commercial source. Thus, marks relying in whole or in part on "OMAHA"—such as the Omaha Steaks marks— are only entitled to narrow protection. *Id.*

The Board's analysis was flawed. As we underscored in *Century 21*, the "relevant *du Pont* inquiry is '[t]he number and nature of similar marks in use *on similar goods.*'" *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992) (quoting *Weiss Assocs., Inc. v. HRL Assocs., Inc.*, 902 F.2d 1546, 1548 (Fed. Cir. 1990)).

In *Century 21*, the parties' marks were both used in relation to insurance services. However, the Board found that since "Century" was used in a wide variety of trade names and marks, "the public would not regard CENTURY as such an unusual term in a trade name or mark." *Id.* Therefore, they would never "expect all companies with CENTURY in their name to be related, or all products or services with CENTURY in their marks to emanate from a single source." *Id.*

Reversing the Board, we emphasized that the controlling inquiry is the extent of third-party marks in use on "similar" goods or services. *Id.* "It is less relevant that 'Century' is used on unrelated goods or services such as 'Century Dental Centers' or 'Century Seafoods.'" *Id.* at 877–78. As a result, we held that the "paucity" of marks containing "Century" in "businesses similar to insurance" suggests that "CENTURY 21 is indeed a unique mark for insurance services." *Id.* at 878.

Here, the Board cited to a list of third-party businesses that have "Omaha" in their name. In so doing, the Board relied on a diverse range of third-party products, such as "popcorn," "wine," "oriental foods," and "alcoholic

beverages." J.A. 42. But these goods bear no relationship to meat or meat-based products. Accordingly, such goods are not "similar" to meat products.

Resisting this conclusion, GOP insisted at oral argument that popcorn is similar to meat. Oral Arg. at 21:53–22:18. In GOP's view, because most of its third-party use evidence can be categorized as "food products" or products sold in a "grocery store," they are relevant under the sixth *DuPont* factor, which requires only similar—not identical—goods. *Id.* at 21:31–52, 27:31–44. GOP's position is unpersuasive for two reasons.

First, GOP's position lacks support in the record. For example, the Board made no analysis or factual findings explaining how popcorn and meat are somehow similar products. Even if the Board had made such a finding, there is insufficient evidence to support it. There is simply no meaningful evidence to back up GOP's view that these two distinct types of food are related. The same evidentiary gap exists for explaining why goods and services for oriental foods, alcoholic beverages, café food, or grocery delivery services are "similar" to meat. *See* J.A. 42. GOP's attempt during oral argument to label these uses as food or grocery store products does not solve this problem. GOP invites us to assume that simply because these various uses can be bucketed into such broad categories, they are similar to meat for the relevant public. We decline to do so. In sum, GOP's arguments only highlight the Board's flawed analysis here, which failed to focus on goods shown to be similar to meat.

Second, our decision in *National Cable Television Ass'n v. American Cinema Editors, Inc.*, 937 F.2d 1572 (Fed. Cir. 1991), counsels against GOP's overbroad view of what qualifies as a "similar good." In *National Cable Television*, we made clear that the present analysis only involves goods like those being offered by the parties to the "relevant public," while third-party use outside of that

relevant market is meaningless. *Id.* at 1579–80. We emphasized that the "real world segment of the public is limited to the market or universe necessary to circum-scribe purchasers or users of products or services like those being offered by the parties" under a common mark. *Id.* at 1579. Such limits are important to the rationale underlying this factor. "Only if other offerings under the 'common' mark are also directed to that relevant public is it reasonable to infer that they may have become condi-tioned to draw fine lines between sources of 'related' goods or services." *Id.* To punctuate this point, we explained:

> To take an extreme example, ACE for canned, large peas could not escape likelihood of confusion with a prior use of ACE for canned, small peas be-cause ACE is concurrently used by unrelated third parties on aircraft, clothing, computer services, hardware or even bread, bananas, milk and canned carrots. Properly defined, the relevant public in the example need be defined no broader than purchasers of canned peas, and the third party ACE marks outside the segment become es-sentially irrelevant.

*Id.*

Accordingly, we agreed with the Board that nothing in the record showed any third-party marks had narrowed the scope of the opposer's mark for the relevant public. *See id.* at 1580 (concluding that no third-party marks and uses were as closely related as "the virtually identical uses of the parties are to each other").

Here, the Board found the parties' respective marks were both used on "meat" products. Indeed, earlier in its analysis, the Board concluded that the parties' goods were identical. J.A. 34. The Board also found that the relevant public was no broader than "ordinary consumers who eat meat and beef." J.A. 22.

In turn, GOP's mark on meat products cannot escape a likelihood of confusion with Omaha Steaks' prior use on meat products in the relevant market for meat purely because other "Omaha" marks are being used by third parties on popcorn, alcoholic beverages, or other food products. Independent of these third-party uses on other goods, there may still be confusion between Omaha Steaks' marks and GOP's new mark for consumers purchasing meat.[3]

When the marks featuring "Omaha" on unrelated goods are properly understood as having no real probative value for the analysis at hand, the evidentiary universe is much smaller. GOP's remaining relevant evidence largely consists of third-party meat products from meat processing or packaging companies, such as B.I.G. Meats Omaha, Omaha Beef Company, and Omaha Meat Processors.[4] Because the Board based its narrow decision on

---

[3]    The remaining case law cited in GOP's briefing does not unsettle this conclusion. Indeed, given the nearly identical overlap between the parties' products and third-party products in those cases, the similarity of the goods was not at issue. *See, e.g.*, *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1373 (Fed. Cir. 2015) (evaluating marks for use on "clothing" with third-party use of similar marks on clothing); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1337 n.1, 1338–40 (Fed. Cir. 2015) (evaluating marks for "restaurant services" and "juice bar services" with third-party use of similar marks in food service industry).

[4]    GOP argued that the 118 registrations discussed in the Board's fact-findings were not relevant to third-party usage. Oral Arg. at 19:26–45, 20:17–39. To the extent the Board's opinion could be read to incorporate these registrations into its analysis of similar goods, the

irrelevant evidence of unrelated goods, its analysis under the sixth factor was legally flawed. We therefore vacate its finding and instruct the Board to reweigh the limited, relevant evidence of third-party use.

## IV

Turning to the last factor at issue, Omaha Steaks mounts two main arguments. First, it argues that the Board failed to consider the challenged mark in its entirety when evaluating the similarity of the parties' marks. Second, it contends the Board's conclusion under this factor rested heavily on the now-vacated evidence of third-party use regarding the geographic term "Omaha."

## A

Omaha Steaks' first argument is that because the Board omitted the word "BEEF" from its reproduction of the slogan in the GOP mark, it failed to consider the mark in its entirety.

The slogan in the Opposed Mark states in full: "PROVIDING THE HIGHEST QUALITY BEEF." During its discussion of the marks, however, the Board stated:

> Defendant's mark is dominated by the words GREATER OMAHA; they are the first words in the mark, are visually larger than the laudatory slogan, "PROVIDING THE HIGHEST QUALITY," and are the words that would be used to call for the goods.

J.A. 47–48.

Omaha Steaks' argument carries little force. The absence of "BEEF" from a single sentence in the Board's order appears to be nothing more than a typographical

---

vast majority of the third-party trademarks are also irrelevant as they, too, are unrelated to meat.

error. Omaha Steaks makes no response to the fact that on seven separate occasions, the Board's opinion correctly referred to the Opposed Mark's slogan in its entirety. In three instances, the Board recited the complete five-word slogan with the word "BEEF" textually. J.A. 2, ll. 2–3; J.A. 2 n.2. In four other instances, the Board reproduced the full mark graphically, including the "BEEF" slogan. J.A. 2, l. 4; J.A. 28, l. 11; J.A. 46, l. 13; J.A. 52, l. 6.

Ignoring these accurate recitations, Omaha Steaks insists this particular passage of the Board's opinion confirms it failed to consider the marks in their entirety. According to Omaha Steaks, the Board improperly focused on the more prominent words appearing in both marks—e.g., "Omaha Steaks" and "Greater Omaha"—while conspicuously leaving out the slogan and its reference to beef. *See* Appellant's Reply Br. 2 (discussing J.A. 49).

Omaha Steaks is correct that the first *DuPont* factor examines the "similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361. "But 'in articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties.'" *In re Detroit Athletic Co.*, 903 F.3d 1297, 1305 (Fed. Cir. 2018) (quoting *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985)).

As such, Omaha Steaks takes the Board's statements out of context. In the cited portion of its analysis, the Board was examining the dominant features of the marks. For the Opposed Mark, the Board reasoned that the dominant words were "GREATER OMAHA" because they are "the first words in the mark" and are "visually larger"

than the slogan.  J.A. 47.  As for the Omaha Steaks mark, it found "OMAHA STEAKS" was the dominant feature.

Contrary to Omaha Steaks' view, the Board then considered the "additional matter in the two marks, i.e., the slogan and steer head design in Defendant's mark and the generic term STEAKS in Plaintiffs mark."  J.A. 48–49.  The Board concluded the slogan and other matter "while less dominant, also contribute to the differences in appearance and sound" between the marks.  J.A. 49.  While Omaha Steaks may not like that conclusion, we cannot say that the Board ignored the slogan in its analysis.

Omaha Steaks' reliance on *Juice Generation*, 794 F.3d at 1341, is misplaced.  Rather than giving "no significance to the term" and thus failing to consider the mark in its entirety, *see id.*, here the Board adequately assessed the slogan.  Indeed, it found that the distinct slogan was one of the differences between the marks overall.

In sum, Omaha Steaks has not shown any error in the Board's analysis here.

## B

Omaha Steaks' second argument is that the Board's analysis of this factor relied on its findings regarding third-party use.  As these findings have now been vacated, Omaha Steaks contends we must also vacate its conclusions under this factor for further analysis.  We agree.

While weighing the similarities and differences between the marks, the Board decided to discount one of the main similarities in the marks—the use of the word "Omaha"—in large part because that word was in use by third parties as a geographically descriptive term for the city of Omaha.  It reasoned that when "the geographically descriptive term 'Omaha' is viewed with the evidence of *third-party uses* of OMAHA trademarks and trade names, these differences outweigh the similarities, resulting in

different overall commercial impressions." J.A. 49 (emphasis added). Based on this third-party use, the Board concluded this *DuPont* factor favors finding no likelihood of confusion.

As discussed above, however, the Board's findings regarding third-party use improperly relied on marks found on dissimilar goods and services not directed to the relevant public. Those findings have now been vacated.

Accordingly, we also vacate the Board's conclusion under this first factor and remand for further analysis.

## CONCLUSION

For the foregoing reasons, we vacate the Board's decision that there is no likelihood of confusion between Omaha Steaks' and GOP's marks, and we remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

## COSTS

The parties shall bear their own costs.